## Case No. 14,371.

UNION MILL & MIN. CO. v. FERRIS et al.

[2 Sawy. 176;[1] 16 Int. Rev. Rec. 114.]

Circuit Court, D. Nevada. May 28, 1872.

PUBLIC LANDS—TITLE OF GOVERNMENT—WATERS —APPROPRIATION—ADVERSE USE—PRESUMPTIVE GRANT—IRRIGATION RIGHTS—REASONABLE USE —STATUTES.

1. The government of the United States has a perfect title to the public land and an absolute and unqualified right of disposal. Neither state nor territorial legislation can, in any manner, modify, or affect the right which the government has to the primary disposal of the public land.

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

2. A stream of running water is part and parcel of the land through which it flows, inseparably annexed to the soil, and the use of it as an incident to the soil passes to the patentee of the land.

[Cited in Ison v. Nelson Min. Co., 47 Fed. 201.]

3. The government as proprietor of land through which a stream flows has the same property and right in the stream that any other proprietor would have.

4. The appropriation of water flowing through the public land confers no right on the appropriator, either against the government or its grantee, in the absence of congressional legislation qualifying the effect of the government patent. And this is so although the customs, laws and decisions of the courts of the state wherein the land lies, recognize and enforce rights acquired by prior appropriation in controversies between occupants of the public lands without title from the government.

5. So long as the title to land, through which a stream of water flows, remains in the United States there can be no use, or enjoyment of the waters of the stream, which will avail the person so using, as a foundation for title by prescription against the grantee of the government. In order that such use may ripen into a prescriptive title, it must continue for the full period required by the statute of limitations after the title to the land has passed from the United States.

[Cited in Wimer v. Simmons (Or.) 39 Pac. 11.]

6. If a proprietor below on a stream has, by reason of an adverse use by a proprietor above, presumptively granted to the upper proprietor, a right to use the water of the stream in a particular manner, such grant affects only the property owned by the proprietor below at the time the presumptive grant must have had its origin, and he may afterwards purchase other lands on the stream and will hold the latter unaffected by such presumed grant.

7. The act of congress of July 26, 1866 (14 Stat. 253), is prospective in its operation, and does not in any manner qualify or limit the effect of a patent issued before its passage.

[Cited in Beaver Brook Reservoir & Canal Co. v. St. Vrain Reservoir & Fish Co. (Colo. App.) 40 Pac. 1069.]

8. If, when the act was passed, the defendant had acquired such a right, by priority of possession, as the act contemplates, that right is confirmed in him, as against one claiming, as riparian proprietor merely, through a patent subsequently issued, and when no right had vested in the patentee before the act became a law.

9. The use of water by a riparian proprietor does not become adverse until it amounts to an actionable invasion of another's right.

10. A riparian proprietor may lawfully divert the water of a stream, for the purpose of irrigating his land, to a reasonable extent. But in no case may he do this so as to destroy or render useless, or materially affect the application of the water by other riparian proprietors.

11. Water for irrigation is not a natural want in the same sense that water for quenching thirst is, which a riparian proprietor may satisfy without regard to the rights and needs of proprietors below.

12. Every proprietor of land by or through which a stream of water naturally flows, may make a reasonable use of the water for any useful purpose. What is a reasonable use depends upon the circumstances of each case.

[Cited in Mason v. Hoyle. 56 Conn. 272, 14 Atl. 786; Jones v. Adams (Nev.) 6 Pac. 445.]

13. Elements which may enter into the inquiry of reasonable use stated.

14. It seems that a riparian proprietor is only entitled to take the water from the stream on his own land, and must return the surplus to the stream before it leaves his land. At all events, the fact that a proprietor took the water at some distance above, and returned the surplus at some distance below, his land, would have an important bearing upon the question of reasonable use.

Bill in equity to restrain the diversion of water.

: Sunderland & Wood, Williams & Bixler, and A. C. Ellis, for plaintiff.

R. S. Mesick and Clarke & Lyons, for defendant.

Before SAWYER, Circuit Judge, and HILLYER, District Judge.

HILLYER, District Judge. This suit was commenced on the fourth day of August, 1871, to enjoin the defendant from an alleged wrongful diversion of water from Carson river. Albert Ferris having since the commencement of the suit acquired the interest of Peter Lightle, one of the original defendants, has been substituted as a defendant. Lightle answered separately, and the present decision involves only the questions at issue between the complainant and the defendant Albert Ferris. This is one among several causes instituted by the complainant against numerous residents along the Carson river, in Carson valley, and has been submitted as, in several respects, a test case. It appears that in the spring of 1861, B. F. Wheeler and others located, as a possessory claim, the land upon which the Merrimac mill is situated. In May of that year, the construction of a mill was commenced, and it was completed in September following. A dam and mill-race, for conducting the water to the mill, were made at the same time. The possessory claim to this land, with the mill and water privilege, have been conveyed to the complainant. Since its completion, the mill has been propelled by the water of the Carson river; and, saving temporary stops, has been constantly run for the purpose of reducing metalliferous ores. The complainant is now owner in fee of the land upon which the mill, dam and mill-race are situated, the foundation of its title being patents emanating from the United States. Two of these, for forty acres each, are dated September 15, 1864; and the third, for one hundred and sixty acres, is dated October 10, 1866. The waters of Carson river naturally flow through each of these parcels of land.

In the year 1858, one T. F. Bowmer entered upon a portion of the public land situated about twenty miles above the point where the complainant's mill stands. This possessory claim was after several mesne conveyances finally conveyed to Peter Lightle, the grantor of Ferris. Lightle continued in the actual possession of the land, and on the 15th of June, 1865, obtained a patent from the United States for 158 33/100 acres, and on June 26,

1869, a patent from the state of Nevada for 80 acres. This is arable farming land, and the east fork of Carson river flows naturally through both parcels. In 1860, Lightle and Bowmer, being then joint possessors of this land, diverted a portion of the water of the east fork of the river, and conducted it by means of a ditch on to this land, where it was used for irrigation. Water has been used, to some extent, continuously on this land since that year in the irrigating season. Prior to the issue of the patents therefor, the land of both parties was public, and the property of the United States. The defendant admits a diversion of water, and claims a right to do so on the grounds: Firstly, of prior appropriation and use; secondly, of prescription; and thirdly, of riparian proprietorship.

It is also claimed that the act of congress of July 26, 1866, confirms the right of defendant, acquired by priority of appropriation. We consider it to be entirely clear that before the title to these lands was acquired from the government of the United States, no occupancy or appropriation of the water by either party, no state or territorial legislation, or rule of decision established by the state courts in controversies between occupants of the public land, without title from the government, can in any manner qualify, limit, restrict or affect the operation of the government patent; that the government has a perfect title to the public land and an absolute and unqualified right of disposal; that a stream of running water is part and parcel of the land through which it flows, inseparably annexed to the soil, and the use of it as an incident to the soil passes to the patentee, who can be deprived of it only by grant, or by the existence of circumstances from which it is the policy of the law to presume a grant; that the government, as proprietor of the land through which a stream of water naturally flows, has the same property and right in the stream that any other owner of land has, be it usufructuary or otherwise, and that a statute of limitations does not run against the United States. Upon the foregoing propositions it is not deemed necessary to enlarge. They seem incontestable, and we shall content ourselves with a reference to the case of Vansickle v. Haines, 7 Nev. 249; wherein the authorities are collected, and the law stated in the clearest and most satisfactory manner; and the case of Gibson v. Chouteau, 13 Wall. [80 U. S.] 93. In Vansickle v. Haines, the court held: That the United States is the absolute and unqualified proprietor of all the public land to which the Indian title has been extinguished; that running water is primarily an incident to the ownership of the soil over which it naturally flows; that the government patent conveys to its grantee, not only the land through which a stream naturally flows, but also the stream; that neither territorial nor state legislation can in any wise impair or modify the right of the government to the primary disposal of the soil; that stat-

utes of limitation do not run against the state, so that no use of water while the title to the land is in the government, can avail the defendant, as a foundation of title by prescription, or defeat, or modify the title conveyed to the grantee by his patent. After examination we are constrained to say, in the language of Mr. Justice Garber, in that case, that not only the weight of authority, but all the authorities support these propositions.

We propose now to consider how the question of prescription would stand if the act of congress of July 26, 1866, had not been passed; secondly, the effect of that act; and thirdly, whether there has in fact been any such adverse enjoyment as warrants the presumption of a grant.

And firstly, on September 15, 1864, one David Gammel obtained a patent for what is now the upper portion of complainant's land, consisting of two forty-acre tracts. On October 10, 1866, Oliver Racicot obtained a patent for the lower portion, embracing one hundred acres. The complainant's mill is on the lower premises, the dam and race on the upper. As none of the time during which the defendant used the water prior to the issue of the patents, can be counted as part of his adverse possession, his prescriptive title could have had no legal commencement as against Gammel's title, before September 15, 1864, nor as against the title of Racicot, before October 10, 1866. From September 15, 1864, to the commencement of this suit, is more than five years; and from October 10, 1866, to its commencement, is less. Thus any prescriptive title to the water, must have its origin after September 15, 1864, and before October 10, 1866. Admitting for this argument, that the defendant had acquired by adverse use a right to divert the water as against the Gammel title, can that affect the title acquired from Racicot, the complainant being now the owner of both titles. A very little examination will show that it cannot. What the defendant in effect claims, is, that after Gammel acquired the government title to the upper premises, and before the title to the lower had passed from the government, Gammel made a grant to the defendant of a right to use a portion of the waters of the stream flowing through his land, which, without such grant, he could have insisted should descend to him. At the time this grant must have its origin, the government had not conveyed, but was still the owner of the lower premises. It certainly needs no argument beyond this statement, to show that Gammel could convey to the defendant no interest of any description in the land below, which was then the property of the United States. We may, under certain circumstances, presume a grant, but we cannot presume that such grant conveyed, or attempted to convey something to which the presumed grantor had no title. It follows that Racicot took from the government in October, 1866, a perfect title to his land, unaffected by any grants made by proprietors above him. This is the title by which the complainant holds the lower premises.

But it is said that the right of defendant by prescription as against the complainant, was, in law, a grant by complainant to defendant, at least as against premises conveyed by the patents of 1864, and that the complainant cannot now defeat that grant by the purchase of premises lower down on the stream. This position seems untenable. We have already seen that the titles to the upper and lower premises were distinct at the time the grant must have originated, the upper being owned by Gammel, the lower by the United States. It has also been shown that the easement claimed can be attached only to the upper premises, because there could be no presumption of grant or adverse use as against the lower premises, while the property of the United States. If we admit that the complainant's grantor Gammel, granted, in fact, the water right claimed to the defendant, it was a grant of a parcel of the estate he then had in the upper premises, and the complainant took the upper premises subject to that grant; but it is impossible to see how the purchase by the complainant afterward of another parcel of land, no part of which had been conveyed to defendant, can be said to be an act destructive of the force of the grant made by the owner of the upper premises. The union of the two titles long after the grant was made, cannot operate to enlarge the grant. The defendant has the easement which was granted to him in the upper premises, but as he never had any in the lower, it can make no difference to him whether the latter are owned by the complainant or some other person. In Bliss v. Kennedy, 43 Ill. 68, the complainant purchased from the defendant Kennedy a lot of land upon which there was a factory and a water privilege. Afterward the defendant purchased a tract of land above, built a factory and used the water of the stream therein. The claim of the complainant was, that Kennedy, by his deed to Bliss of the lot and factory below with the "appurtenances," virtually covenanted that his grantee should have the use of the water as it then came to the factory—the flow of the water being appurtenant to the land granted. Kennedy, at the time of making this deed, had no right, title or claim to any land, save that on which the factory was erected. "By his deed," says the court, "he cannot be held to have sold and conveyed anything but the land and factory specified in it, and the appurtenances to that land and factory then belonging. * * * All that belonged to the tract conveyed, and over which Kennedy then had dominion, passed by his deed under the

term 'appurtenances.' Kennedy, when he conveyed the factory and land with its appurtenances to complainant, owning nothing outside the boundaries of the land conveyed, above or below the factory, could convey nothing; and, therefore, no part of the stream above the factory could pass as appurtenant to it." So, in this case, the owner of the upper premises at the time the presumed grant must have had its origin, having no interest in the premises below, could convey none to his grantee. The complainant then, by virtue of his ownership of the lower premises, has a right to have the water of the river flow to these premises, unaffected by any right arising out of an adverse use as against the upper premises, unless there is something in the act of congress qualifying that right in respect to the lower premises.

On July 26, 1866, congress passed an act, entitled "An act granting the right of way to ditch and canal owners over the public lands, and for other purposes," and it is therein among other things enacted, "that whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same." 14 Stat. 253. Prior to the passage of this act, the policy of congress had been, as shown by its legislation, to grant to purchasers of the public land the bed of a non-navigable stream flowing through the land sold, and the lines of sections were run without reference to the meanderings of such stream; so that the purchaser of land through which a non-navigable stream flowed, took the bed of the stream and such riparian rights to the water of the stream as belong to the owner of the soil. Several attempts had been made to provide by law for the survey and sale of the mineral lands; the survey to be rectangular, as in case of other lands. These attempts had always been successfully resisted by the mining communities, because, among other reasons, such a survey and sale would have been ruinous to the possessors of quartz lodes, which do not descend perpendicularly, but at a greater or less angle. For seventeen years prior to 1866, the mineral land of California and Nevada had been occupied by the citizens of the United States, without objection on the part of the government. Canals and ditches were dug during this time, often at great expense, over the public lands, and the water of the streams diverted by these means for mining and other purposes. Local customs grew up in the mining districts, by common consent, and by rules adopted at miners' meetings for governing the location, recording and working of mining claims in the particular mining district. Possessory rights to public lands, mining claims and wa-

ter, were regulated by state statutes, and enforced in the state courts. The rules, customs and regulations of the miners were also recognized by the courts, and enforced in trials of mining rights. The courts not applying, in all respects, the doctrine of the common law respecting the riparian owners in deciding between these possessors, none of whom had title to the soil, recognized a species of property in running water, and held that he who first appropriated the waters of a stream to a beneficial purpose, had, to the extent of his appropriation, the better right as against persons subsequently locating on the stream, above or below; and that the first appropriator might conduct the water in canals, ditches and flumes wheresoever he pleased, and apply it to whatsoever beneficial purpose he saw fit, without any obligation to return it to the stream whence it was taken, or preserve its purity or quantity. Kidd v. Laird, 15 Cal. 161; Weaver v. Eureka Lake Co., Id. 271; Lobdell v. Simpson, 2 Nev. 274; Ophir Silver Min. Co. v. Carpenter, 4 Nev. 534. In this posture of affairs, the persons who had constructed these canals and ditches, at an expense of hundreds of thousands of dollars, in many instances, over the public land, saw when the question of the sale of those lands was agitated, that should such sale be made, they, as to these possessory rights, would be at the mercy of the buyer of the legal title, without some protective legislation. The act of 1866, section 9 of which we have quoted in part, was a consequence of this state of things. It gives the possessor of a quartz lode a right of pre-emption, and it declares that the person who has acquired a right to the use of water by priority of possession shall be maintained and protected in the same, if such right is recognized and acknowledged by the local customs, laws and decisions of courts. The policy of this enactment, so far at least as it relates to agricultural districts, may be doubtful, but it is the law of the land, and the courts must carry out what appears to be the intention of the legislature, as therein expressed. And that, as indicated by the act, appears to be to grant to the owner of possessory rights to the use of water under the local customs, laws and decisions, the absolute right to such use, which the government alone could grant. Under this law, when a possessory right to the use of waters is claimed, whether or not such right exists, will be determined by reference to the local customs, laws and decisions, and the question will be determined just as it would have been had it been raised between occupants before the title to the land had passed from the government. When the right is thus ascertained, the statute has the force of confirming it to the person entitled under the local laws and decisions. But the act is prospective in its operation, and cannot be construed so as to divest a part of an estate granted before its passage. If it be admit-

ted that congress has the power to divest a vested right by giving a statute a retrospective operation, that interpretation will never be adopted without absolute necessity. Blanchard v. Sprague [Case No. 1,518]; Vansickle v. Haines, 7 Nev. 249. As this law, being general in its terms, cannot be held to operate retrospectively, it follows that the defendant's patent of June 15, 1865, and the complainant's of September 15, 1864, are in no manner qualified by this act, passed subsequent to their issue. As against these patents, neither can claim any right to the use of the water by virtue of prior appropriation or possession, but in respect to them, their rights to the water must be fixed by the law applicable to them as owners of the soil through which the stream naturally flows.

But if when the act was passed, the defendant had such a right by priority of possession as that act contemplates, upon the construction which must be given, that right is confirmed in him, and he is entitled to protection as against one claiming as riparian proprietor merely, through a patent issued after, and when no right had vested in the patentee, before the act became a law. The statute is, in effect, incorporated into such subsequent patent, and operates as an exception out of the estate granted to the complainant by the patent of October 10, 1866. If we have rightly interpreted the act of congress, and the operation of the patents issued before and after the passage of that act is as we have stated, the case stands in this wise: The defendant's claim by virtue of adverse enjoyment, falls to the ground, because sufficient time has not elapsed since the lower premises were conveyed by the government. He cannot sustain his claim by force of the act of congress, because the complainant's patents of September, 1864, were made before the act was passed, and conveyed the upper premises absolutely, and free from any claims by prior possession merely. We have hitherto been considering the questions of prescription and the act of congress separately, as it was desirable to determine the effect of the act and of the patents upon these water rights. But the complainant having taken the lower premises, subject to such right as the defendant had acquired by priority of possession and the act of congress of 1866, if he had also acquired by adverse use, a right as against the proprietors of the upper premises, to divert and use the same quantity of water in the same manner that he would have by virtue of his prior appropriation, this would be a complete defense to this action, for the complainant's right would not be infringed by the diversion, either as proprietor of the upper or lower premises. It is, therefore, necessary to ascertain whether there has been in fact such adverse use by defendant as affords a presumption of a grant from the proprietor of the upper premises of the complainant.

The answer of this defendant sets out his prescriptive right as follows: "That for more than five years prior to the commencement of this suit, he has, during the irrigating season of each year, under claim of right, openly, continuously and peaceably, and adversely to the complainant and all persons whatsoever, used the waters of said Carson river in irrigating said land, and the crops of grass, grain and vegetables grown thereon, and for stock and domestic purposes; whereby defendant has acquired the absolute and exclusive right to use a part of the water of said Carson river in manner and for the purposes aforesaid."

The claim is of a right to use a part of the water of the river during the irrigating season, for irrigation, stock, and domestic purposes. The bill charges the unlawful diversion to have commenced on the first day of July, 1871, and continued until the commencement of this suit, August 4, 1871. The testimony shows that the irrigating season upon the defendant's land for grain, ends on or before the first of July, and for grass, from the first to the middle of July. Prior to the issue of complainant's patent of September 15, 1864, we have seen the five years could not commence to run in defendant's favor. The patent having been issued after the irrigating season of 1864 was over, the earliest moment the time could begin is the irrigating season of 1865. But the defendant's use is not adverse until it becomes injurious to the complainant, and amounts to an actionable invasion of its right. Holsman v. Boiling Spring Bleaching Co., 1 McCarter [14 N. J. Eq.] 335; Ang. Water Courses, 386; Washb. Easem. 125. It is not sufficient to show a use of the water in a particular way, but it must also appear that such use caused such injury to the complainant as would justify an action for its redress. A thorough reading of the testimony fails to show any such use of the water in the irrigating seasons of 1865 or 1866 (and we need go no further) as amounts to a violation of the complainant's right, or as would have justified an action against the defendant. Lightle testifies that "water was used on the land continuously since 1860 until 1870. The water was used on the land during the irrigating season, and at other times it ran through the ditch." The capacity of the Lightle ditch is the same now as in 1861, but what the capacity was is not shown. Lightle further says that during the years 1861-2-3-4 "a great deal more" water was used on the Lightle land than in subsequent years. How much less in later years does not appear. Nor does it appear what quantity of water was diverted in 1865 and 1866, nor how much was absorbed or lost, nor what surplus found its way back into the river. Nor is it shown that the complainant was injured at its mill in the month of July of those years by lack of water to run its machinery. The witness McGill

states that in 1865 there was not sufficient water to run all the machinery in the mill in August, September and October; that in 1866 the supply was about the same as in 1865, and that in 1867 he don't think the machinery of the mill was much retarded. If any inference could arise, from this lack of water, that the defendant's use was the cause, or partially so, it does not aid the defendant; because the scarcity in those years occurred after the close of the irrigating season, and consequently at a time when the defendant does not claim a right to divert the water and use it for irrigation. It is not shown by the testimony that in these years of 1865 and 1866, the use of the water by defendant during the irrigating season of those years caused any injury to the complainant. It devolves on the defendant to show when his adverse use began, or that it began at least five years before the bringing of this suit. This he has not done. So far as appears, his use of the water during the irrigating seasons of 1865 and 1866 may have been a reasonable and proper exercise of his riparian rights, and entirely consistent with the complainant's full enjoyment of its right to use the water. For without deciding here to what extent water may be used for irrigation, it will not be denied that a riparian proprietor may lawfully make some use of it for that purpose, so that the simple fact that the water was used for irrigation, does not show that the complainant's right was violated. The defendant does not even show that his use of the water in the years mentioned sensibly diminished the water in the river, and if it did not, the complainant was not injured actionably, under the narrowest rule laid down in any case. The adverse use must be under claim of right. Defendant, in his answer, alleges his use to have been under claim of right during the irrigating season, and he must be confined to that period. The burden of proof is on him, and he must establish his adverse enjoyment in the most satisfactory manner, before the court can indulge in any presumption that the complainant granted to him any material portion of the motive power of its mill. For this failure to show, by clear and unequivocal proof, that subsequent to the complainant's patent of September 15, 1864, and five years anterior to the commencement of this suit, the use of the water amounted to an actionable invasion of the complainant's right, the defendant's claim of title by prescription must be denied.

It remains to determine whether the defendant, as alleged in the bill, wrongfully diverted water from the river between the first day of July and the fourth day of August, 1871. A large part of the testimony submitted was taken in other causes, and, by agreement of counsel, used in this, and so much of it has no bearing on this case that it has been found somewhat difficult to arrive at the facts. The following, however, may be stated as bearing on the question now to be decided:

The climate of Nevada in the summer is arid. The year 1871 was an unusually dry one, and less water ran in Carson river than ever before known; and in the latter part of July, and in August and September of that year, there was less water by one half than in ordinary seasons. In the months of July and August, 1871, the complainant's mill could not be operated for want of sufficient water, and had to suspend. One Danberg farmed the Lightle (defendant's) land in 1870 and 1871, Lightle himself having left his farm in 1870. Lightle's land is agricultural, and requires irrigation to make it productive. The Lightle ditch is taken out of the east fork of Carson river, at a point in section 5, township 12, a considerable distance from the Lightle land, which is situated on other sections, and through it water is conducted on to that land. The capacity and grade of the ditch are not stated, but Lightle's answer admits a diversion since the first day of July, 1871, of "about two thousand inches (as it flows)," part of which was used by Danberg on his own land. Danberg says he ran the ditch as full as he could get it in 1871, and at times used one half of the water on Lightle's and one half on his own land; at other times, when not needed on Lightle's land, the whole was carried on to his. The Lightle land embraces two hundred and thirty-eight acres, but how much of it was under cultivation in 1871 does not appear. It lies, in the main, between the east and west forks of Carson river, which unite above the complainant's premises. It appears that a part of the water used on the Lightle land does "find its way" into the west fork and some into the east; but in both cases after it has left the defendant's land. As to the quantity or proportion of the water returned to either fork there is nothing definite. Witness Read, who was there in July and August, 1871, says very little, if any, found its way back to the river. The east fork is on higher ground than the west, and water runs off from it to the west naturally. It does not appear what quantity of water was flowing in the east fork at Lightle's in July, 1871. Many other persons were diverting water from both the east and west forks in July and August of that year. As before said, the "irrigating season" as respects the Lightle land ends, for grain, July 1, or before that; for grass, from the first to the middle of July. Some seasons, Lightle says, he does not need water at all for irrigating grain. It is not shown how many acres of Lightle's land were cultivated for grass or for grain. Danberg says he farmed the Lightle land, and that is all there is on this point. It does not appear that in 1871 any of the water was used on Lightle's land for household purposes, or for watering stock, and as Lightle was not living on the land

this year, probably the water was used for the sole purpose of irrigation.

There can be no doubt, in this case, that the diversion of the water on to Lightle's land, and allowing it to be absorbed there after July 15, when the irrigating season was over, was an unreasonable use of the water, and the complainant is entitled to relief so far. The defendant does not claim a right to so use the water, except during the irrigating season. As to the period from the first to the fifteenth of July, a part of the irrigating season, it is necessary to determine whether the defendant has the right to use the water for irrigation to any extent, and if he has, to what extent. The complainant denies his right to use the water for irrigation to its injury in any degree. The defendant, on the other hand, claims that in a hot and arid climate like ours, water may not only be used for that purpose, but it is a natural want, like the thirst of men and cattle, to satisfy which the riparian proprietor, who has the first opportunity may consume, if necessary, the whole stream, and that such use under the conditions existing here is reasonable.

The law on this subject is stated by Chancellor Kent in the third volume of his Commentaries, and has very frequently been quoted both by the courts of England and America with unqualified approbation. It is this: "Every proprietor of lands on the bank of a river has naturally an equal right to the use of the water which flows in the stream adjacent to his lands, as it was wont to run (currere solebat) without diminution or alteration. No proprietor has a right to use the water to the prejudice of other proprietors, above or below him, unless he has a prior right to divert it, or a title to some exclusive enjoyment. He has no property in the water itself, but a simple usufruct as it passes along. Though he may use the water while it runs over his land, he cannot unreasonably detain it, or give it another direction, and he must return it to its ordinary channel when it leaves his estate Without the consent of the adjoining proprietors. he cannot divert or diminish the quantity of water which would otherwise descend to the proprietors below, nor throw the water back upon the proprietors above without a grant, or an uninterrupted enjoyment of twenty years, which is evidence of it. This is the clear and settled doctrine on the subject, and all the difficulty that arises consists in the application. Streams of water are intended for the use and comfort of man; and it would be unreasonable and contrary to the universal sense of mankind. to debar every riparian proprietor from the application of the water to domestic, agricultural and manufacturing purposes, provided the use of it be made under the limitations mentioned; and there will, no doubt, inevitably, in the exercise of a perfect right to the use of the water. be some evaporation and decrease of it, and some variations in the weight

and velocity of the currents. But de minimis non curat lex, and a right of action by the proprietors below would not necessarily flow from such consequences, but would depend upon the nature and extent of the complaint or injury, and the manner of using the water. All that the law requires of a party by or over whose land a stream passes, is, that he should use the water in a reasonable manner, and so as not to destroy or render useless. or materially diminish or affect the application of the water by the proprietors above or below on the stream." In England it seems that a proprietor is not permitted to use water for irrigation, if thereby he sensibly diminishes the stream. Wood v. Waud, 3 Exch. 748; Embrey v. Owen, 6 Exch. 353. In this latter case, it was said: "Nor do we mean to lay down the rule that it would in every case be deemed a lawful enjoyment of the water, if it was again returned into the river with no other diminution than that which was caused by the absorption and evaporation attendant on the irrigation of the lands of the adjoining proprietor. This must depend on the circumstances of each case. On the one hand, it could not be permitted that the owner of a tract of many thousand acres of porous soil, abutting on one part of the stream, could be permitted to irrigate them continually by canals and drains, and so cause a serious diminution of the quantity of water, though there was no other loss to the natural stream than that arising from the necessary absorption and evaporation of the water employed for that purpose; on the other hand, one's common sense would be shocked by supposing that a riparian owner could not dip a watering-pot into the stream in order to water his garden, or allow his family or cattle to drink it. It is entirely a question of degree. and it is very difficult, indeed impossible, to define precisely the limits which separate the reasonable and permitted use of the stream from its wrongful application." And it was there held, that as the "diminution of the water was not perceptible to the eye," the use of it by the defendant for irrigation was not unreasonable, or prohibited by law. Actual. perceptible damage. it seems, would give a right of action. In our own country, while any general or unlimited right to use water for irrigation has been denied, it has sometimes been said, that owing to differences in the climate and the size of the streams, a more liberal use is allowed than in England. In Maine, it is held that a proprietor may make a reasonable use of the water for domestic purposes. for watering cattle, and even for irrigation. provided it is not unreasonably detained, or essentially diminished. Blanchard v. Baker, 8 Greenl. 253. In Connecticut, the doctrine is thus stated: "The right of the defendant to use the stream for purposes of irrigation cannot be questioned. But it was a limited right, and one which could only be exercised with a reasonable regard to the right of the plaintiff to the use of

the water. She was bound to apply it in such a reasonable manner and quantity as not to deprive the plaintiff of a sufficient supply for his cattle." Gillett v. Johnson, 30 Conn. 180. The stream in question rose on the defendant's land, and naturally flowed to the plaintiff's, who had a place on his land for watering his cattle, and the whole stream could be run in a half-inch pipe. The supreme court of Massachusetts say: "That a portion of the water of a stream may be used for the purpose of irrigating land, we think is well established, as one of the rights of the proprietors of the soil along or through which it passes. Yet a proprietor cannot, under color of that right, or for the actual purpose of irrigating his own land, wholly abstract or divert the water-course, or take such an unreasonable quantity of water, or make such unreasonable use of it, as to deprive other proprietors of the substantial benefits which they might derive from it if not diverted or used unreasonably." Elliot v. Fitchburg R. Co., 10 Cush. 191. In New York, "the defendant has a right to use so much water as is necessary for his family and his cattle, but he has no right to use it for irrigating his meadow if thereby he deprives the plaintiff of the reasonable use of the water in its natural channel." Arnold v. Foot 12 Wend. 330. It would be useless to cite or quote more from the numerous cases on this subject. The result of the authorities appears to be well expressed by Mr. Washburn in the late edition of his work on Servitudes and Easements, in the following language:

"The right of a riparian proprietor, jure naturæ, to divert water from a stream, when reduced to a simple proposition, seems to be this: he may not do it for any purpose except domestic uses, and that of irrigating his land; and whether and to what extent he may do the latter, depends, in each particular case, upon whether it is reasonable, having regard to the condition and circumstances of other proprietors upon the stream, and this is to be determined in all cases of doubt, by a jury. But in no case may he do this so as to destroy, or render useless, or materially diminish, or affect the application of the water by other proprietors." Washb. Easem. (2d Ed.) p 240, § 2 subd. 12. The fundamental principle upon which the authorities all go is this: That every proprietor of land through or by which a stream of water flows, may make a reasonable use of it for any useful purpose. What is a reasonable use, depends on the circumstances of each case, and cannot be stated in a general rule. Every proprietor along the stream has an equal right to its use and benefit. All have a usufruct; none have any absolute property in the water, and no one has a right to use it unreasonably to the injury of his neighbor, above or below. It is sometimes stated that the proprietor above may exhaust the stream for household purposes, and for watering his cattle; and that to this extent, having the first

opportunity, he has a preferred right. If this be so, it is still upon the ground that the use is reasonable under the circumstances. No case is recollected where this precise question was necessarily involved; and it may admit of question whether an upper proprietor on a small stream would be permitted to consume the whole of it in watering his cattle, and deprive his neighbor below of sufficient water to quench the thirst of himself and family. In some cases, the wants of riparian proprietors have been divided into natural and artificial; natural wants being primary wants, and such as are absolutely necessary to be supplied, such as thirst of people and cattle; and artificial wants being secondary, and such as are simply for the comfort, convenience or prosperity of the proprietor, and these latter are held to be subservient to the former. Ang. Water Courses, 210, 1. In Evans v. Merriweather, 3 Scam. 496, the supreme court of Illinois make this division of wants, and say that while water for irrigation is an artificial want in Illinois, in a hot and arid climate it would be a natural want. There was no question in that case in regard to irrigation, and the remark is simply dictum. The supreme court of Texas, in Rhodes v. Whitehead, 27 Tex. 304, said upon this subject: "It may be admitted, that the purpose of irrigation is one of the natural uses, such as thirst of people and cattle, and household purposes which must absolutely be supplied; the appropriation of the water for this purpose would therefore afford no ground of complaint by the lower proprietor if it were entirely consumed," and they cite Evans v. Merriweather. The question evidently received no consideration, but the court made the admission, as courts often do, because admitting such a right to use the water for irrigation, the defendant in that case had exercised his right in an unlawful manner, and the case went off on that point.

These two cases are the only ones referred to as sustaining the defendant's claim that water for irrigation is, in this climate, a natural want, and we are asked to class it with the want of water to quench thirst of men and cattle. To put the use of water for irrigation upon the same footing as the use of it to satisfy thirst, is to say that an upper proprietor may take the whole stream, if needful to the growth of vegetation upon his land, and leave those below him without water to drink. This certainly cannot be law in any climate. But "water for irrigation" is not a natural want in the same sense that water to quench thirst is. If it were it could not be made to depend upon the climate. Water is a natural want of man and beast in every country and climate. So water is a natural want of vegetation everywhere, without reference to the climate, for the laws of vegetable growth are the same in Illinois and in Nevada. Irrigation is a mode of applying water to satisfy this want. Hence it does not seem to be entirely accurate to

say that "water for irrigation" is a natural want in Nevada and not so in Illinois. What is true. undoubtedly, is, that there exists in this climate a greater necessity for the application of water to the purpose of irrigation than in countries where the rain falls during the summer months, and this may be a proper fact to consider in determining the question of reasonable use. To lay down the arbitrary rule contended for by the defendant. and say that one proprietor on the stream has so unlimited a right to the use of the water for irrigation, seems to us an unnecessary destruction of the rights of other proprietors on the stream, who have an equal need and an equal right. The more we examine the more we become impressed with the wisdom of the common law rule, that each proprietor may make a reasonable use of the stream, and that what that is depends upon the circumstances of each case. It will also be seen from the rule, as before stated, that the question of reasonable use is not to be determined solely by the wants of the party using the water—whether the amount is reasonably sufficient for his own lawful purposes—but reference must also be had to the rights and needs of other proprietors upon the stream. "The necessities of one man's business cannot be made the standard of another man's rights in a thing which belongs equally to both." Wheatley v. Chrisman, 24 Pa. St. 302; Brace v. Yale, 10 Allen, 447; Hayes v. Waldron, 44 N. H. 583, 584. No more definite rule can be safely laid down which will be of universal application. Under this rule the character of the soil and climate, instead of fixing the right absolutely, become circumstances only to be weighed in determining the question of reasonable use. The climate of Nevada is arid in the summer season, and the soil then needs irrigating to make it productive, but not always to the same extent. In the valley of the Carson river, some of the land needs little or no irrigation, other portions require a great deal. The defendant's land requires less water than that of his neighbor Danberg. Indeed, some seasons he says it needs no water for irrigating in order to raise grain. This must be considered in ascertaining the extent to which Lightle may reasonably use the water. There will also enter into the inquiry the nature and size of the stream, the uses to which it can be or is applied, the nature and importance of the use claimed and exercised by one party, as well as the inconvenience or injury to the other party; the proportion of water diverted, compared with the whole volume of the stream; the quantity lost and absorbed; the manner of taking and conducting the water on to the land; the mode in which it is used there; the quantity of land under cultivation; the kind of crop; the means adopted for returning the water to its natural course; and all other matters bearing upon the question of fitness and propriety in the use of the

water. Hayes v. Waldron, 44 N. H. 580; Thurber v. Martin, 2 Gray, 394. And it may occur that a use reasonable one season will become unreasonable at another. When the Carson river is full it is a large stream, and probably every proprietor might then use so much water as he saw fit, for irrigation or any other useful purpose, without affording any ground of complaint to those below him, while at low stages of water such an extensive use might cause great injury, and could not be permitted. When there is an insufficient quantity to satisfy all the wants of all, if it is possible to do so, is it not more reasonable to apportion the water as fairly as may be among the proprietors, than to permit one who happens to be above to satisfy all his wants without regard to those of his neighbor below? In regard to the comparative benefits derived by our community from mining and agriculture, or the injury which it will sustain by fostering one at the expense of the other, they may be questions involved in the consideration of what constitutes a reasonable use. Irrigation must be held, in this climate, to be a proper mode of using water by a riparian proprietor, the lawful extent of the use depending upon the circumstances of each case. With reference to these circumstances the use must be reasonable, and the right must be exercised so as to do the least possible injury to others. There must be no unreasonable detention or consumption of the water. That there may be some detention and some diminution follows necessarily from any use whatever. How long it may be detained or how much it may be diminished can never be stated as an arbitrary or abstract rule. It is now only necessary to apply these principles to the circumstances of the case in hand. After the middle of July. as we have said, the diversion was unjustifiable because the irrigating season had then closed. As to the period from the first to the middle of July. there was manifestly an unreasonable use and waste of water, but the testimony is not so clear and full upon some points as we could wish. We are not informed with any degree of precision what quantity of water was then flowing in the river; what crop was irrigated, although it may be presumed that it was hay or grain, or both; what quantity was diverted beyond the very indefinite admission in the answer of "about 2,000 inches as it flows;" what quantity of water would irrigate the defendant's land. nor how many acres were under cultivation, nor how much water was returned to the river. We do know that the ditch was kept full of water; that a portion of the time one half of the water was used on the Lightle land, and one half on Danberg's, and that at other times. when not wanted on the Lightle farm. it was all used on Danberg's.

It may also result from the principles established by the authorities. that the riparian owner is only entitled to take the water

from the stream on his own land, returning it to the stream before it leaves his land. This point does not appear to have been expressly decided, but whenever the authorities allude to it at all, they speak of taking the water on the land of the riparian proprietor, and returning the surplus before it leaves the land, as though this was a well-recognized condition of a proper use. However this may be, it would not be permissible to take the water at some distance above, and return the surplus at some distance below, the land of the riparian proprietor using the water, if, thereby, a considerable portion of it would be wasted before reaching the land, or after leaving it, and before it is returned to the stream, to the injury of other riparian proprietors below. At all events, this circumstance would have an important bearing upon the question of reasonable use.

The defendant diverts the water at a point considerably distant from his land, and his ditch does not return any of the water to the river, but either conducts it on to Danberg's farm, or leaves it, principally, to find its way through sloughs or down the natural declivity to the west fork, more than a mile distant, some little perhaps to the east fork, whence it is taken. This statement, we think, shows that the use made of the water by the defendant at the period in question was unreasonable, and amounted almost to wanton waste. Certainly, the defendant cannot, by virtue of his ownership of the soil, justify the diversion of twice as much as he needed on his own land, and permit the other half to run upon the land of another. Nor does it seem that the defendant can justify the diversion of so much as 1,000 inches of water "as it flows" to irrigate his grass land. For although this quantity is quite indefinite, it is evident that 1,000 cubic inches of water constantly flowing is a very considerable quantity, even if we admit the grade of the ditch, which is not given, to be slight.

From the testimony of Klauber as to his own land, it appears that 400 inches of water would irrigate 400 acres of land, if kept constantly flowing. But as the grade of the defendant's ditch is not given, we have no means of knowing how much the 1,000 inches "as it flows" exceeds one inch to the acre of defendant's 238 acres, as measured by Klauber.

Upon the case as now presented no final decree, which will properly adjust the rights of the parties, can be entered. The case must be referred to a master to make inquiry and report, whether the defendant has adopted the mode which causes least waste in taking the water from the river, and if not, what mode consistent with the fair and beneficial use of the water by him can be adopted; what means are employed to return the water to its natural channel, and are they the means best calculated to prevent waste, if not or if none have been employed, what method will best effect that object; what amount of water per acre is needed during the irrigating season to irrigate defendant's land; some standard of measurement of the water, and the quantity measured by such standard, flowing in the river and in defendant's ditch at the time mentioned in the bill. Until the court is in possession of these facts it is not possible to determine the extent to which the use by the defendant was unreasonable, and to which he ought to be enjoined. The decree of the court must be drawn up accordingly, and all other matters are reserved until the coming in of the master's report.