### STATE *v.* DICKINSON.

1. PUBLIC LANDS—GRANT—PRESUMPTION AS AGAINST STATE.
   A grant of lands of which there is no direct evidence may be presumed from facts and circumstances, even as against the State.

2. SAME—EVIDENCE—SUFFICIENCY.
   In ejectment by the State, it appeared that defendant or his grantors had occupied the land for over 100 years under claim of title, and had paid the taxes thereon; that the land was situated on the Canadian frontier; and that records relating to such lands, including government grants, and recognitions of the imperfect titles of settlers equivalent thereto, were lost. There was also evidence showing that an Indian deed of the land to one of defendant's grantors was recorded in the British records in 1780; and it was further shown that at that time it was the policy of the British government to oust settlers whose claims of title were based merely on conveyances from the Indians, and that, while other settlers were ousted, defendant's grantors were never disturbed. *Held,* sufficient to raise a presumption of a grant from the government.

Error to St. Clair; Eldredge, J., presiding. Submitted November 22, 1901. Decided December 30, 1901.

Ejectment by the State of Michigan against Don M. Dickinson and another. From a judgment for defendants, plaintiff brings error. Affirmed.

*Horace M. Oren,* Attorney General (*Avery Bros. & Walsh* and *Geer & Williams,* of counsel), for appellant.

*Elliott G. Stevenson* and *Benjamin S. Warren,* for appellees.

MOORE, J. This action is ejectment, brought by the State of Michigan against Don M. Dickinson and another, to recover certain lands situate on Stromness or Dickinson Island, being a part of St. Clair Flats, in St. Clair county. There are two cases. While the title to only the lands described in the declaration can be settled in this case, the decision of the court will control as to the entire island, except the private claim, in all amounting to about 3,500 acres. From a judgment in favor of the defendants, the case is brought here by the plaintiff by writ of error.

The cases were tried before the late Judge Eldredge. A large mass of testimony was taken. The learned judge filed carefully prepared and voluminous findings of fact and conclusions of law. It will not be necessary to state them all. He found that Stromness Island is the island mentioned in a deed from the chiefs of the Chippewa nation of Indians to James Thompson of the 22d of September, 1780.

"That the earliest settlements were made in the last century, as early as 1783, for farming purposes, upon Stromness Island, and were four in number, between which there were, on and before 1850, recognized boundaries, to wit: *First,* the portion occupied by James Thompson; *second,* the portion occupied and improved by John Lawton; *third,* a settlement under one Eddy, who claimed under James Thompson, under whom subsequently one Cartwright claimed (the same Thompson to whom the

Chippewa Indian deed of the whole island ran, as the same is in evidence), and which is also known as the Gage and Davenport tract, and on which was also settled at one time Angus McDonald; the *fourth* and last settlement was next below the Cartwright or Gage and Davenport tract, and was a settlement under the same John Lawton. These settlements embraced the whole island within their claimed boundaries."

The judge then discusses a controversy which arose between parties each of whom claimed under Cartwright, which was passed upon by a board of land commissioners created by act of Congress. The findings then continue as follows:

"That previous land boards having jurisdiction in Michigan territory under acts of Congress had declined to entertain applications for confirmation of titles or possessory rights, under the acts of Congress which created them, for lands on this island, because of the doubts existing as to whether the island was within the dominion of his Britannic majesty or within the United States, as expressed in article sixth of the treaty of 1814."   8 Stat. 218.

"That some of the records of the land commissions, covering the time when the settlers on Stromness Island might have entered their claims with the register in the time and manner provided by law (Act March 3, 1807; 2 Stat. 437), have been lost, and cannot be found; that the records of the land board under the act of 1820–1823 (3 Stat. 572, 724) show that claims were entered and presented on behalf of settlers on Stromness Island, or their grantees or heirs, before earlier land boards, and that some of the records of the proceedings of said earlier land boards, and as well the original papers and documentary evidence relative to claims entered, had passed into the hands of the enemy during the war of 1812–1814, and were reclaimed only partially and in fragments, and had not escaped mutilation.   Therefore, because of these facts, and the long-continued and undisturbed possession of the settlers on Stromness Island, under the circumstances and conditions hereinafter stated, as a matter of fact, under a presumption in favor of such possession, the proper entries with the register in the time and manner provided by law were made by the several settlers on this island."

He found that the policy of the British government,

which was especially enforced by the king's lawfully authorized officers along this boundary both before and after the War of Independence, was to give notice to all persons contemplating settlement that they were strictly forbidden from settling under grants to individuals from the Indians or Indian tribes without permission or authority from the crown, or until the Indian title to the lands was merged in the crown, and the confirmation granted to *bona fide* settlers.

"That, during the enforcement of this policy, there was recorded in the registry of conveyances of lands in Canadian territory, and kept under the authority of the officials of the British government, the deed bearing date September 22, 1780, from the chiefs of the Chippewa Indians of the whole of Stromness Island to James Thompson, as shown by said records, now transferred to and a part of the records of Wayne county, Michigan ;  *  *  *  that there was a similar record kept of transfers and evidence of titles to lands from the British government, and that a record was kept of land titles of the character included in the proceedings of the land board for the district of Hesse, from the year 1784 to the month of May, 1790, which has been lost, and of which no trace exists at the time of this hearing.

"That records affecting Indian titles, or the action of the British government in respect to claims of settlers upon lands claimed under Indian titles,  *  *  *  including Stromness Island,  *  *  *  are mixed, scattering, and incomplete, some probably having been lost; that of said records containing land grants for the same territory embraced in the province of Hesse, and confirmations of Indian grants by the government, some are in the crown land department at Toronto, others at Ottawa, Quebec, and Montreal, and some Indian documents have been taken to England; that such records in Montreal, Quebec, and Ottawa are unclassified, unindexed, and in such masses and confusion with other documents that such records as aforesaid of Indian titles are inaccessible to search.

"That the island in question was embraced in the district of Hesse, a division of territory established by the British government through Lord Dorchester, captain general and commander in chief of the province of Quebec, by proclamation under and in the name of the crown, on

July 24, 1788, and before this was embraced in the province of Quebec, in North America, by the imperial act 14 Geo. III. chap. 83, in 1774.

"That the possession of the said settlers, Dickinson's original grantors, was never disputed or disturbed by the British government, nor their title called in question by it, from before the close of the war, 1783, until the claim of jurisdiction of Great Britain ended by surrender of possession or evacuation in July, 1796."

"That by the treaty of the United States with the Chippewas, known as the 'Treaty of Detroit,' the Indian title to all lands not vested in settlers within the boundary stated in the treaty, which embraced Stromness Island, was extinguished and vested in the United States, and that by act of Congress approved April 25, 1808 (2 Stat. 502), it was provided that the lands to which the Indian titles were extinguished by the said treaty of Detroit should be made a part of the district of Detroit, and be offered for sale at that place; and the unsurveyed lands on Stromness or Dickinson Island were never offered for sale by the United States, either before 1822 or afterwards."

"That from the acquirement of the possession and jurisdiction of the territory including this island in July, 1796, by the United States, to the present time, the possession of the Lawtons and Thompson, and of those under them and their grantees, has never been disturbed by the United States government, or any of its authorities."

"That Brown, who conveyed to Morrison in 1830, and Morrison, who conveyed to Abram Smith in 1843, both of whom held possession under and through grants from John Lawton, made in 1817, and Angus McDonald, who lived and died upon the island, were all British subjects, and supposed they held possession under the British government.

"That at the time of the passage of the 'swamp-land act' (9 Stat. 519), so called, in 1850, the said defendant Dickinson, his ancestors and grantors, had been in continuous, undisputed, undisturbed, and unquestioned possession of the lands in suit for a period of nearly 70 years."

The judge also found that from 1847 to 1885 these lands were regularly assessed against the persons who claimed to be the owners thereof, and the taxes were paid thereon. He also reviews the correspondence which was had, commencing about 1885, between the officers of the State land

129 MICH.—15.

office and the officers in charge of the Federal land office, which shows that the Federal authorities declined to recognize any right upon the part of the State or of individuals to have these lands surveyed, because of the claim made by Mr. Dickinson to be the owner. He also reviews at length the proceedings had before congressional committees in relation to these and similar lands. He then found as a conclusion of law that:

"In view of the provisions of article 2 of the treaty of 1794 (8 Stat. 117), the presumption arises as against the State, and as against the United States, of a valid grant by the British or Canadian government to the defendant's grantors, through whom he claims title, or a recognition by the said governments of their right of property in and right of possession to the then settlements on the mainland of Stromness Island, now claimed by defendant, and permission by said governments so to possess and occupy the same, equivalent to a grant made subsequent to their possession and settlement in or near 1780.

"From the evidence in this case, the presumption arises of a recognition or confirmation of the title of the defendant's grantors, or a right of possession and property in their settlements and the lands on the mainland of said island, which is equivalent to a grant by the United States made subsequent to the treaty of 1783." 8 Stat. 80.

"I find as a matter of law, under the evidence, that by *mesne* conveyances there is an unbroken chain of title to the lands in this suit from the earliest settlers or original claimants of the title to the mainland on said island, in or near 1780, down to the defendant.

"That the right and title of the owners of the main body of the island extends to the middle or thread of the channels of the St. Clair river, where such channels are the boundaries thereof, and, where the boundary is the shallow inlet of Goose Bay, extended to the middle of said inlet, including the margin or border thereof of low or marshy lands."

A great many interesting and important questions are presented by the record. We deem it unnecessary to discuss many of them, as we think the determination of whether the record fairly gives rise to the presumption of an ancient grant will dispose of the important question in

the case. The case is ably briefed, and the court has been greatly aided by counsel in investigating the questions involved in the case. Counsel on the part of the State say:

"The finding of a presumption of ancient grant against either the United States or the British government is erroneous, because: (*a*) The evidence shows there was no grant; (*b*) there can be no presumption of ancient grant against government; (*c*) the doctrine of prescription is not applicable to this case."

They then quote voluminously from the record to show that there was no ancient grant, and that defendant's father knew there was none when he made his purchase; and then say:

"There is no way for titles to land to be devested out of the United States except in strict pursuance of some law of the United States. Occupancy and possession alone, even for a great length of time, cannot ripen into title as against the United States. *Drew* v. *Valentine*, 18 Fed. 712. There can be no use or enjoyment which will avail the person so using as a foundation for title by prescription, while the title remains in the United States. *Union Mining Co.* v. *Ferris*, 2 Sawy. 176 (Fed. Cas. No. 14,371). Prescription or adverse user will not mature into title as against the United States. *Mathews* v. *Ferrea*, 45 Cal. 53. There can be no presumption against government. *Wilkins* v. *McCue*, 46 Cal. 661; *French* v. *Commonwealth*, 5 Leigh, 512 (27 Am. Dec. 613). Occupation of the public land can never be adverse to the government, so as to defeat or affect in any way the title subsequently conferred by its grant or patent. *Morrow* v. *Whitney*, 95 U. S. 551, 557. That Indian titles are void, see *Johnson* v. *McIntosh*, 8 Wheat. 543; *Buttz* v. *Northern Pacific Railroad*, 119 U. S. 55 (7 Sup. Ct. 100). The Indian title being a nullity, those holding under it had simply bare possession. The case of *Crane* v. *Reeder*, 21 Mich. 77 (4 Am. Rep. 430), settles the law in Michigan that there can be no presumption of ancient grant against government on bare possession."

Counsel on the part of the defendants contend that the testimony disclosing the loss of records relating to land

titles along the frontier, including government grants, and recognitions of the imperfect titles of settlers in possession equivalent to grants, of a period when such governmental acts affecting the title of Thompson and those claiming under him, if any, might appear, together with the fact, as shown, that the policy pursued by the British and American governments of the period in question was to oust settlers whose claims of title were based on bare purchases or conveyances from the Indians; the further evidence that the Indian deed to Thompson of September, 1780, is found recorded in the British record coming from the final custody of the British government at Quebec, Detroit (when British), and Sandwich; all taken in connection with the admitted fact that said Thompson and the grantees had been in open, notorious, continuous, and actual physical possession of the whole of the mainland of Stromness Island, as claimed by the defendant, during that period and since, for more than 100 years,—constitute evidence tending to show a grant, or a confirmation or recognition of title equivalent to a grant, from the government to Thompson, or those claiming under him; that the defendants do not rest their claim simply upon the deed from the Indians, but insist the record shows such recognition of title upon the part of the government as gives rise to the presumption that a grant from the government did in fact exist.

The first question calling for consideration is, May a grant be presumed against the State from facts and circumstances where the original grant cannot be produced, and where there is no record thereof? This question is answered in the affirmative in the following cases: *Archer* v. *Saddler*, 2 Hen. & M. 370; *People* v. *Rector, etc., of Trinity Church*, 22 N. Y. 44, and cases cited therein; *Fletcher* v. *Fuller*, 120 U. S. 534 (7 Sup. Ct. 667), and cases cited therein; *Fuller* v. *Fletcher*, 44 Fed. 34, and cases cited therein; *Roe* v. *Ireland*, 11 East, 280; *Stevenson's Heirs* v. *McReary*, 12 Smedes & M. 9 (51 Am. Dec. 102); *Grimes* v. *Corporation of Bastrop*, 26 Tex. 310. In Tyler, Ej. 568, it is said:

"Presumptions of grants of land often arise, but never unless the lapse of time be so great as to create a belief that such grants were actually made, or unless the case made shows that the party claiming the presumption was legally or equitably entitled to it. A conveyance will not, in general, be presumed where the original enjoyment was consistent with the fact of there having been none. *Doe* v. *Reed*, 5 Barn. & Ald. 232. But where the plaintiff produced an original lease of the premises for a long term, and proved possession for 70 years, the *mesne* assignments were presumed. *Earl* v. *Baxter*, 2 W. Bl. 1228. And the jury were directed to presume that a grant regularly issued where a certificate of survey had been returned, and there were sundry conveyances of the land, and possession by persons claiming thereunder. *Thornton's Lessee* v. *Edwards*, 1 Har. & McH. 158. Presumptions of grants are founded upon the general infirmity of human nature, the difficulty of preserving muniments of title, and the public policy of supporting long and uninterrupted possessions. They may be encountered by contrary presumptions, and can never fairly arise where all the circumstances are perfectly consistent with the nonexistence of a grant. *Jackson* v. *Mancius*, 2 Wend. 357. And, in general, the presumption of a grant is limited to periods analogous to those of the statute of limitations, in cases where the statute does not apply. Where the statute applies, the presumption is not generally resorted to; but, if the circumstances of the case are very cogent, and require it, a grant may be presumed within a period short of the statute. *Ricard* v. *Williams*, 7 Wheat. 59."

In the case of *Crane* v. *Reeder*, 21 Mich. 24 (4 Am. Rep. 430), the court discuss the question of whether the title in that case was affected by the lapse of time, and say:

"The doctrine of presumption of title from ancient grant is quite as inadmissible. If such a presumption can ever be allowed to dispute the accuracy of the public acts and records, it cannot be permitted when there is in the case positive and unquestioned evidence showing that no title existed, or was ever set up, on behalf of Reeder, beyond his assumption of possession."

This statement indicates a decided difference between that case and the one at bar. It would also indicate that

title from ancient grant might, in a proper case, be presumed.

In *Steinhauser* v. *Kuhn*, 50 Mich. 367 (15 N. W. 513), in an opinion by Justice CAMPBELL, it is held that, where one holds title under a series of deeds from persons in possession claiming title running back for a considerable period of time, the presumption of title from the government arises, subject to be rebutted. This decision was cited with approval in *Drake* v. *Happ*, 92 Mich. 580 (52 N. W. 1023).

The next question which presents itself is, Does the evidence fairly give rise to the presumption of an ancient grant? It has already appeared that defendants, their grantors, and those through whom they claim title, had been in the continuous, open, and notorious possession of these lands, claiming to be the owners thereof, for more than a century, before any question was raised as to their title. For a long series of years these lands were assessed and taxes paid thereon. This possession began before the United States exercised any control over the lands in controversy, and while the government of Great Britain did exercise control over them. We will not attempt to recite all the testimony, but, in addition to what has been stated, the record discloses that Great Britain, at the time of the Indian deed to Thompson and afterwards, was especially enforcing by active means its policy against Indian titles, purchases from Indians, or Indian deeds "not obtained by the king's permission and authority," and that this policy was especially commanded to be enforced in the territory in which these lands were situated, in the following words: "That you do not suffer any settlements to be made with the above titles, or any new settlements to be begun, on any pretense whatever, and that you pull down as fast as any person shall presume to build up;" that after the establishment of land boards, and while the British government was still exercising jurisdiction, the report was made to the British government that practically all the lands in the district from Long Point, in Lake Erie, to

Lake Huron (which would include this island), had actually been parceled out, and were in possession of individuals under deeds from the Indians; and these were not to be recognized unless sanctioned or permitted, as aforesaid, by the crown. It also appears as late as October 26, 1789, that all persons having claims by gift or purchase from Indians or others to any part of the land situated between Long Point, on Lake Erie, and Lake Huron, should communicate their titles and pretenses forthwith to the land board of the district of Hesse. Yet it appears at this very period, and pending the enforcement of the vigorous policy before this, the Indian deed to James Thompson was on record in the official record of conveyances for the province of Quebec prior to the organization of the district of Hesse, and after the organization of the district of Hesse, and that, on the appointment of the land board, this record was in the hands of the secretary of that land board, and yet that at all times from 1780 the possession of the lands in the three settlements thereon of the defendant's grantors was undisturbed and unquestioned, and not interfered with in any manner by the officers of the crown appointed to vigorously enforce the policy against Indian deeds "without permission of the crown," and possession under them, within the territory between a point in Lake Erie and a point in Lake Huron; that, in these conditions, it appears by positive evidence, and not by inference, a record similar to the one in which the record of that Indian deed appeared, existed from the year 1784 until the year 1790, which might explain this immunity of the island settlers; and, further, it appears by positive evidence, and not by inference, that that record is wholly lost. The possibility that the government officials were ignorant of these island settlements under claim of title by the Indian deed is negatived by the fact that the original Indian deed to Thompson was in the official records, giving notice to the authorities at Quebec before the organization of the district of Hesse, and after that was in the hands of the land board charged to enforce the policy.

It also appears that, before the organization of any land board, certain purchases from Indians in this district were validated "by the king's permission and authority" by the method of special instructions of the direct representative of the king in Canada, the commander in chief, who was the governor in chief, issued to his subordinate in command at the post of Detroit; and presumably that policy was followed before and after that date.    It is also shown that records existed which covered such actions of the commander in chief in relation to Indian titles, which have been practically lost.

Testimony was also offered tending to show that, if titles were not confirmed resting on Indian deeds, it was still the policy of Great Britain, as to actual occupants or settlers under Indian purchases made without " permission of the crown," to confirm the title after taking the title of all such lands to the crown.    Afterwards, on May 21, 1790, it appears that all these lands so settled upon under Indian purchases without permission were acquired by the crown, and it appears that the territory so acquired, on which such instructions were to be carried out, was that between Long Point, in Lake Erie, and a point in Lake Huron.

The presumption from the testimony is irresistible that there was a valid recognition and "permission from the crown" and confirmation from the British government of the title.    The fact that the Indian deed appears recorded in the official records of the province of Quebec, and in the books of records containing the official proceedings of the land board of this territory, would of itself be strong evidence of a confirmation or valid recognition of the crown equivalent to a grant, when the government was repudiating any grant by Indians not sanctioned or permitted by the crown; and when the other records of the period are lost.

The judgment is affirmed.

Montgomery, C. J., Hooker and Long, JJ., concurred.    Grant, J., did not sit.