STATE *v.* VENICE OF AMERICA LAND CO.

1. APPEAL AND ERROR—REVIEW—EQUITY.
     Upon the appeal of a cause in equity to the Supreme Court, the
     entire record is open for examination, while a judgment at
     law may only be reviewed to ascertain whether or not the
     evidence supports the findings of the lower court.

2. INDIANS—LAND GRANTS—CONVEYANCES.
     Grants of land to settlers by Indians made in the latter part of
     the eighteenth century were not recognized by either the
     American or British government.

3. PUBLIC LANDS—GRANTS—PRESUMPTIONS—LOST INSTRUMENTS.
     No presumption exists that a grant of lands near the Cana-
     dian boundary at the mouth of the St. Clair river was exe-
     cuted by the British government to early settlers, who ob-
     tained Indian deeds of the property and made several in-
     effectual attempts to confirm their title through the tribu-
     nals of Canada and the United States, and finally secured an
     act of congress recognizing their title to other adjacent lands,
     but failed to claim at any such times the existence of a prior
     British grant, or the loss of papers relating thereto.

4. SAME—PATENTS OF LAND—DESCRIPTION—ESTOPPEL.
     The acceptance of such patent of lands from the United States
     with definite descriptions of the parcels granted estops the
     grantee from claiming adjacent public lands not included
     thereby or otherwise conveyed.

5. SAME—GREAT LAKES—NAVIGABLE WATERS.
     Unsurveyed lands within the meander lines of Lake St. Clair
     at the mouth of the river, partly submerged at all times and
     wholly overflowed at regular intervals, included in Harsen's
     Island, are *held* to be a part of the bed of Lake St. Clair, and
     to have passed to the State by virtue of its admission to the
     Union.[1]

6. SAME—EVIDENCE.
     The depth of water upon submerged land is not important in
     determining the ownership.

[1]As to title to land under water, see note to *Goff* v. *Cougle* (Mich.),
42 L. R. A. 161.

7. SAME.

Its condition, when the State was admitted into the Union, is conclusive of the question of title to the land.

8. SAME.

The State of Michigan holds title to the bed of the Great Lakes in trust in its sovereign capacity for the use of the people.

9. TRUSTS—STATUTE OF LIMITATIONS.

As to such lands held under the express trust, no statute of limitations runs against the State.

Appeal from Macomb; Erskine, J. Submitted January 22, 1910. (Docket No. 117.) Decided April 1, 1910.

Bill by the State of Michigan to enjoin the Venice of America Land Company from taking possession of, platting, and selling certain land. From a decree for complainant, defendant appeals. Affirmed.

*John E. Bird*, Attorney General (*Lincoln Avery* and *Grant Fellows*, of counsel), for complainant.

*Frank T. Wolcott, Robert E. Frazer*, and *Alex. J. Groesbeck*, for defendant.

STONE, J. The State of Michigan, through its attorney general, filed its information or bill of complaint in the circuit court for the county of St. Clair, in chancery, alleging that it is the owner of all that part of Harsen's Island lying south of what is known as the "Private Claims," being situate in the township of Clay, St. Clair county, Mich. The information was filed on April 26, 1906, and process, including a writ of injunction, was served on the defendant on April 27, 1906. The case was removed to the county of Macomb.

It is claimed on behalf of the State that it has title to the land in question upon two theories: *First*, by virtue of the swamp land act passed by the Federal congress in 1850; and, *second*, that the premises in question were covered with water and formed a part of the bottom of

Lake St. Clair at the time Michigan was admitted into the Union of States in 1837, and that by the act admitting the State into the Union the State acquired title as trustee for the uses and benefits of the people.

The information was filed to restrain the defendant from selling lots in part of the territory bounded on the north by private claim No. 3, on the south by the waters of Muscamoot Bay, and on the east by unsurveyed land. The defendant had advertised in a newspaper published in the city of Detroit offering for sale lots within this territory, a part of which advertisement included a map of the St. Clair Flats and Harsen's Island, upon which was indicated in black ink the territory claimed by the defendant. The information also stated that the State of Michigan in 1899 passed an act, being Act No. 175, Pub. Acts 1899, providing for the sale, disposition, and control of the swamp and overflowed lands in the township of Clay, St. Clair county, which had the effect to withdraw the same from sale, and reserve it for the use of the people of the State of Michigan as a hunting and fishing resort, which resort has been under the supervision, care, and control of the game warden of the State since July 23, 1899, the date of the approval of said act.

The defendant answered, claiming: That it is the owner in fee through a direct chain of title from one Jacob Harsen (through mesne conveyances), who obtained title from the British government, antedating the title of the United States to this territory, and denying that the State of Michigan was the owner of these premises either through the swamp land act, or the act admitting the State into the Union. That the lands have never been determined to be swamp lands, and that the government has withheld its patent from the complainant under the swamp land act (Act Cong. Sept. 28, 1850, chap. 84, 9 U. S. Stat. 519). That the upper portion of said lands has never been overflowed with water or swamp, but is dry, tillable, and fertile land, and that only a small portion of the lower one-third has ever been rendered unfit for culti-

vation by the overflow of water.   In short, that fully two-thirds of the lands claimed by defendant are dry and high, and not even of a swampy character.   The defendant also answered that the complainant's right of action is barred by the statute of limitations, being section 9724, 3 Comp. Laws.   Defendant also claimed in its answer that the State of Michigan is estopped from claiming title to any of this territory, under the swamp land grant, because the same was not included in the list of lands selected, by virtue of the act of the legislature, from the surveyor general's list in 1852.   It also claimed that the grantors of defendant have always claimed title to the unsurveyed portion of the island for over 100 years, and that its title has never been questioned by the United States.

A large mass of testimony, covering over 1,200 pages of the printed record, was taken, most of it before the circuit judge who heard the case.   The case was submitted to the learned circuit judge, who found for the complainant, and because of the superior advantage which he had in seeing and hearing the witnesses testify, and because of the clearness of his opinion, we quote the same at large:

"This is an information in the nature of a bill in equity exhibited by the State of Michigan against the Venice of America Land Company, a corporation, to restrain the latter from taking possession of and platting and selling certain lands on the lower and unsurveyed portion of Harsen's Island, situate in the township of Clay, St. Clair county, and being a part of the territory embraced within the delta of the St. Clair river.

"The State claims to have derived title to all the unsurveyed part of this island from two sources:   *First,* by the general swamp land grant of 1850, by which congress conveyed to the several States all of the swamp and overflowed lands within their borders.   *Second,* by the act of congress of 1837, admitting it into the Union [Act Jan. 26, 1837, chap. 6,   5 U. S. Stat. 144], by virtue of which that part of St. Clair Flats including the lands in controversy vested in the State in trust for its people; the same being a part of Lake St. Clair.

"The defendant denies title in the State and alleges that the lands in controversy were originally owned by Jacob Harsen, its ancestor in title, who many years ago acquired a grant of the island from the British government.

" The testimony shows that the upper part of the island was settled by Jacob Harsen about the year 1785, and it has been occupied by himself and those claiming under him ever since, except a short period during the war of 1812, when it was temporarily abandoned on account of hostilities. After the treaty of 1783, it became a part of the United States, but remained in the zone of disputed territory until the boundary line was definitely settled by the boundary commission in 1821. The Harsens in 1783 obtained a deed from the Chippewa Indians of a portion of the island, which grant was confirmed by a later deed in 1797, embracing the whole island. But Indian deeds were not recognized by the American or British governments, and Jacob Harsen on July 2, 1790, applied to the British land board, assuming jurisdiction of the territory in question, for a grant of the island, alleging that it contained 700 acres of land. Action on this application was deferred until July 11, 1793, when, as appears by the minutes of the executive council, the highest tribunal in the province, the application was disposed of and it was ordered not granted. No further application was made by Harsen to a British land board for a grant.

"In 1805 the heirs of Jacob Harsen applied to the American land board at Detroit, a tribunal authorized by congress to entertain and dispose of land claims of this nature; but that board declined to receive the claim because of its unwillingness to act on claims to islands in the straits and lakes along the national boundary before the national boundary had been defined. After the determination of the boundary dispute, the Harsens again applied to the American land board at Detroit and were allowed, in pursuance of a partition agreement made between them on August 6, 1821, 640 acres of land each. These claims were numbered 1 to 5, inclusive, embraced the upper part of the island, and constitute what is known as the 'surveyed land.' The survey of these claims was made by the United States government in 1828 and certain monuments, spoken of as 'mounds,' were erected at the lower part of the surveyed land.

"Below these private claims are the lands known as the 'unsurveyed' or 'government' lands. They are low

and marshy and of gradual descent to Muscamoot Bay, a part of Lake St. Clair.   On the South Channel side of these lands, a belt or ridge extends from the island down into the lake, upon which has been erected during recent years, with the aid of dredging, filling, and sheet piling, numerous clubhouses and cottages.   On the Middle Channel side a similar projection extends down into the lake; but the buildings are here not so numerous nor pretentious. All of these structures were erected without title or color of title; the occupants being simply squatters.   Between these strips of land lies Muscamoot Bay, and the distance this extends towards the surveyed lands depends upon the stage of water in Lake St. Clair.   In periods of high water the unsurveyed portion is practically submerged, while during the low stage there are portions upwards of two feet out of the water and capable of tillage.   But these are only small fractions of the area involved, the general character of the lands being low and boggy, covered with marsh grass, cattails, rushes, flags, and other subaquatic vegetation, and constituting an ideal brooding ground and resort for certain wild game, as ducks, snipe, etc.   The State, realizing this, has set it aside as a game preserve and has patrolled it with its game wardens.

"The area of the unsurveyed portion at the average stage of water is upwards of 3,000 or 4,000 acres, including the ponds, sloughs, and bogs.   About one-half of this is land, the other half water, and a greater portion of this land but a few inches above the water and not capable of cultivation.

"The lands claimed by the defendant at the time the bill was filed commenced at or near the lower part of the surveyed lands and extended to Muscamoot Bay, a distance of two miles and upwards.   The boundaries of this claim are indefinite and somewhat elastic; but it is estimated they embrace some 800 acres, and they include the highest portions of the unsurveyed land.   The title relied upon by the defendant is by conveyance from a small fraction of the Harsen heirs, and from others claiming squatters' rights on a small portion of the premises.

"With this general statement of the facts, I will take up the questions involved in the litigation in the following order:

"1. As to the Claim of a British Grant to Jacob Harsen of the Island in Question.   No grant was produced, nor record thereof offered in evidence; but the court is

asked to find as a necessary inference from the facts and circumstances in evidence that such a grant was in fact made, and that it covered the entire island.   In support of this position, the defendant relies upon the testimony of alleged family tradition, long-continued occupancy, and claim of title of the island, by the Harsens, notice to the British government of their claim under Indian deeds, together with the alleged policy of that government to expel persons so occupying without permission or authority from the crown, loss or mutilation of the records of land boards, and various   facts which defendant   claims amounted to a recognition of title in the Harsens by the British and American authorities.

" The defendant seeks to explain the nonproduction of the alleged grant by testimony which, if competent, tends to show that it was destroyed many years ago by fire resulting from an accidental explosion of a keg of gunpowder in the Harsen home, which, it is claimed, destroyed all the title papers and family records, including the family Bible.   It appears, however, that the Harsen heirs in 1821 filed with the American land board at Detroit an Indian deed under which they claimed title, and it is not shown how this particular instrument escaped the fire.

" Some of the Harsen heirs testified to the alleged tradition of a British grant, and say that it was freely talked of in the family by Francis and the other children, while others of the heirs of equal or superior means of information never heard of it.   This is particularly significant in the testimony of Mary L. Stewart, a daughter of Francis, and Augustus Harsen, a son.   The testimony relating to the alleged tradition, assuming that it is competent, is so indefinite and inconsistent with the facts of the case that I am unable to give it any weight.   James May, an attorney of ability, appeared before the land board at Detroit, for the Harsen heirs, in 1821.   It appears from his testimony before the board that he was acquainted with the Harsens and personally knew of their occupation of the island, its abandonment in 1812, its reoccupation, and its improvement.   It also appears that he drafted the Graverat deed for Jacob Harsen in 1789.   He also appeared before the land board in 1805, for the Harsen heirs, and was evidently their family attorney.   Had there been a British grant, he would either have known of it personally or received information of its existence from the family.   He knew undoubtedly that the treaty of 1814 between Great

Britain and the United States expressly provided that grants made by either party thereto during its possession of the disputed islands should be valid. It also appears that Francis Harsen, one of the persons from whom the tradition is alleged to have originated, was before the board as a witness. Yet the British grant was not mentioned, and claimants were content to support their claim on the invalid Indian deed, coupled with occupancy, and to accept a grant of part of the island when they were in fact, as they now allege, already vested with a deed of the whole.

"The reason why the executive council in 1793 rejected the application of Jacob Harsen does not appear from the records. The probabilities are that it was because the island was in disputed territory. Mr. Burton knew of no British grants of islands in this territory after the signing of the treaty of peace in 1783. Our land boards of 1805 declined to entertain applications of this nature for the same reason. This policy would prevent any subsequent reconsideration by the executive council of the Harsen claim, especially after the evacuation of Detroit in 1796. It is claimed that it was the policy of the British government to expel settlers on land whose occupancy was based solely upon Indian deeds, and the fact that Harsen was not molested argues in favor of the existence of a grant from the crown. But Harsen certainly had no grant up to 1793, when his application was refused by the executive council, and had occupied in peace under the Indian deed given in 1783.

"It appears from the report of the land board to Lord Dorchester, dated October 17, 1789, that the whole tract of land from the Point Au Plage in Lake Erie to Lake Huron was claimed by individuals under Indian grants, and the records fail to show that any of these settlers were ejected. There appears to have been a marked disinclination on the part of the local officers intrusted with that duty to oust actual settlers, and the instructions and proclamations on the subject were evidently *in terrorem.*

"In view of these circumstances, coupled with the policy of both countries not to actively interfere in the disputed territory until the boundary was defined, I do not think any inference in favor of a grant can be drawn from the unmolested occupancy of the island.

"I have been unable to find any recognition by the British government of title in the Harsens. As a matter

of fact, the British had parted with title to the island by the Treaty of 1783, which probably antedated the Harsen occupancy. At this time the Walpole (South Channel) was the common ship channel, and the island was thrown naturally to the American side. It was not until later that the North Channel, by reason of its supposed greater depth, came more into general use. It is true the British claimed the island as crown land, but they knew their title was disputed by the American government. D. D. Smith, surveyor general of Canada, in 1799, included it in his list of islands in Upper Canada, and Thomas Smith, deputy surveyor, on November 24, 1809, reported that all islands in the St. Clair river fell to the British side under the cession of 1783. He stated he had taken it upon himself to so announce to the settlers, but adds, however, that the United States had extended its jurisdiction to some of these islands. Notwithstanding the zeal of the surveyor general's department, the executive council apparently refrained from too active jurisdiction over the disputed territory.

"On the part of the American government, it was never informed of the alleged claim of a British grant. Its land board in 1805 declined to pass on the Harsen and other similar claims till the boundary was settled. This is evidenced by the report of the commissioners on land claims in 1823 when they referred to the notoriety of the fact that former boards were at all times unwilling to act on claims to islands in the straits and lakes along the national boundary before the national boundary had been defined, established. The land board in 1821 was simply informed that the Harsens claimed under an Indian deed and occupancy. These claims were allowed and subsequently confirmed by congress in 1828, and patents issued therefor and accepted by claimants. If there was any recognition of title, it was on the part of the Harsens of the title of the United States.

"There was no possession by the Harsens of the unsurveyed lands. During high water, the lands were covered with the waters of the lake. During low water, their cattle pastured portions of it in common with those of the other occupants of the island. Marsh grass was also cut in common on the unsurveyed portion, except on such lands as were occupied by squatters. No fences were built in the early day below the claims, and, when this part of the island became attractive to cottagers, they

located apparently at will. It is true that McQueen, at the Fox Holes, made more or less forcible protests against squatters; but whether this was on the strength of the Harsen title or his occupancy does not clearly appear. McDonald took up quite a large piece of the unsurveyed land adjoining the private claims, and occupied for years, and, although neighbors of the Harsens, no claims were made by the latter of ownership until the Bartholomew survey in 1887. The defendant company platted and advertised for sale over a section of this land without protest from the Harsens, and it was not until this suit was commenced that it became impressed with the value of the Harsen title.

"I do not think that the older generation of Harsens ever made any serious claim of title to the lower part of the island. Some of their descendants in later years, probably influenced by the fact that the island was called 'Harsen's Island,' and by the litigation on Dickinson Island, have set up a claim to it. The cottagers and other occupants of the unsurveyed lands were undoubtedly anxious to obtain color of title to support their possession, and McQueen was able to make conveyance for a small consideration in a few instances; but I do not think that either party to these transactions was much impressed with the value to the interest conveyed. No doubt for a similar reason an effort was made by some of these people to get on the tax roll, and the supervisors may have been willing to accommodate them. I do not think this fact works an estoppel against the State to now claim these lands, especially as it does not appear that any of the Harsens were assessed or paid taxes on these lands.

"For the reasons given, I conclude that the Harsens never had title to the unsurveyed portion of the island.

"2. The Title of the State. I am of the opinion that the United States has not title to these lands, but that the State acquired title thereto, either on its admission into the Union, the lands being then lake bottom, or by virtue of the swamp land grant of 1850. Whether the lands were in fact a part of the lake would depend upon their character in 1837, when the State was admitted into the Union. I apprehend that the depth of water upon submerged lands is not important in determining its ownership. The fee of the adjoining proprietor does not extend to land covered by the waters of the Great Lakes. The title to such land is in the State in trust for the people.

The public is not only interested in navigation, but has the right to hunt and fish in such waters; and it is immaterial whether they are deep or shallow or grown up with aquatic plants. Applying this test, what was the character of this land at the time the State was admitted to the Union?

"While in the Great Lakes there are no appreciable tides, yet the water level varies materially from time to time. During a period of years, the waters in Lake St. Clair gradually rise, followed thereafter by a gradual fall.

"This is a matter of such frequent occurrence that many sailors have it that the water rises and falls every 14 years. The water level is also subject to variations during the different seasons of the year, and, so far as it relates to this island, is materially affected by ice jams in St. Clair river that occur during the spring of the year. High southerly winds also raise the water on the lower part of the island from a few inches to a foot; and during the winter months the unsurveyed lands are covered with ice, with the exception perhaps of a few ridges, or where the land has been artificially raised.

"The highest water on the islands within the recollection of witnesses was in 1837 and 1838; the latter year seeing the culmination of the rise. During this period, some tillable lands on the mainland were abandoned, and a distillery belonging to Stewart on the flats on the surveyed portion was washed away, and he was compelled to move his house to higher ground. The government chart of 1873-74, of Lake St. Clair, refers to the 'high water of 1838' as an epoch of high water, and by comparison shows how far the water levels of 1861 to 1872, inclusive, were below the high water of that period. It is inferable therefore that the water of 1858-59, an intervening period, was not as high as the water of 1837-38. The tables on this chart show that the waters of Lake St. Clair were 1.9 feet lower in 1871, the year the chart was in preparation, than in 1838. The water levels for 1871 show the mean level for that year to be 576.255; so that the water in 1838 was 578.155.

"We have no record of the water levels prior to 1819. In McNiff's report of July, 1793, to the commandant at Detroit, he stated that the island contains nearly 300 acres fit for cultivation. In Harsen's application for a grant in 1790, he stated that the island contained 700 acres. Assuming about one-half of the island was unfit for cultiva-

tion, the estimate of Harsen agrees substantially with that of McNiff. The latter was a surveyor, and made his report in the course of his duty, and it is probable it was reasonably correct. It would therefore appear that the lower part of the island was lake bottom at the time Harsen applied for a grant to the British authorities.

"Testimony of the witnesses clearly shows that the unsurveyed portion of the island in periods of high water was covered with water. This also appears from the government chart of 1873-74, just referred to. The chart was made from topographic as well as hydrographic surveys, and shows nearly all the lands claimed by defendant company to have been covered with the waters of the lake at the time the survey was made.

"It is my opinion that the lower part of Harsen's Island, including the lands in controversy, was covered by the waters of Lake St. Clair when the State was admitted into the Union, and that the State was vested with the title thereto, in trust, and is entitled to the relief asked."

The case is here on appeal by defendant after decree.

We have examined the evidence, documentary and oral, upon the subject of the claimed British grant to Jacob Harsen of the island in question. The evidence strongly tends to negative any such grant. In fact, the evidence satisfies us that the older generation of Harsens never made any real claim to the lower portion of the island, being the unsurveyed land. When the patents were issued for the five parcels, or lots, it is evident that this satisfied the claim made at that time. Every case must be governed by the evidence therein.

It is true that in *State* v. *Dickinson*, 129 Mich. 221 (88 N. W. 621), this court held that a grant of lands of which there is no direct evidence may be presumed from facts and circumstances, even as against the State. That case related to Stromness Island. It was an action of ejectment, and was tried by the circuit judge, who prepared and filed voluminous findings of fact and conclusions of law. This court was only permitted, under the rules of law, to look into the evidence for the single purpose of ascertaining whether there was any evidence tending

to support the finding of the circuit judge. This was found and the finding affirmed.

In the present case the whole record is before us, and is open for examination. It appears that Jacob Harsen made application to the British land board in July, 1790, for such a grant, claiming that the island contained 700 acres. The application was considered by the executive council of the Province on July 11, 1793. This council seems to have been the only tribunal then authorized to confirm a title, or authorize a grant, outside of the crown. It refused the application. The evidence shows that Jacob Harsen settled upon this island in the early eighties, and, inasmuch as he made an application for his grant in 1790, it would seem to be conclusive from this that no grant or confirmation of his claim had been made prior to that time. Before this application he had an Indian deed to a portion of the high land at the upper end of the island. About four years after said refusal of the executive council, and after the British had evacuated Detroit in 1796, two sons of Jacob Harsen obtained a second Indian deed, which refers to the first Indian deed. But Indian deeds were not recognized by either the American or British governments. In 1805 one James May, the family attorney for the Harsens, appeared before a Federal board or commission seeking to have the claim of the Harsens confirmed. He was informed by this board, as appears by his testimony before the American land board, at a later date, that the then board had no authority to confirm titles in the territory of the disputed boundary between Canada and the United States. For this reason no action was taken by that board. It would seem a natural inference, therefore, that there then was no British grant of this territory to the Harsens prior to 1805.

In 1807 an act of congress provided for a commission consisting of the secretary of the Territory of Michigan, the register of the public land office, and the receiver of public moneys of the land office at Detroit, giving the commission, or a majority of it, power to hear and decide

claims to lands. Act March 3, 1807, chap. 34, 2 U. S.
Stat. 437. This commission was continued in existence
by two subsequent acts of congress. Many claimants for
land, and among them the Harsen heirs and those claim-
ing under them, appeared before this commission. This
commission reported recommending the confirmation of
the title of Jacob Harsen's heirs to the upper portion of
this island, and in April, 1828, congress passed an act
confirming the title to those heirs, or claimants under
them, who appeared before this commission. Subse-
quently patents were issued for the said five lots or pri-
vate claims, in the upper part of the island. In *State* v.
*Fishing & Shooting Club,* 127 Mich. 580 (87 N. W.
117), there appears a map which fairly represents the
island, and the location of the five lots and claims, that
were patented. In all these proceedings (and there were
a number of witnesses, including James May, before the
commission) no mention seems to have been made of any
British grant. Nor does there appear to have been any
claim of the loss of any papers relating to a grant. It is
fair to suppose that all of the evidence accessible was pro-
duced. Manifestly the refusal of a grant cannot be the
basis of a presumption of a grant.

We think that the record in this case does not cor-
respond with the record in the *Dickinson Case,* but that
there is a clear distinction between them. We shall
not point out all of these disagreements. In the *Dickin-
son Case* it appeared that his grantors had always claimed
the whole island, and had driven off intruders from all
parts of it. In this case it appears that the territory in
question was used, occupied, and enjoyed, in so far as the
same was capable of being used, occupied, and enjoyed,
by any one who saw fit. Dickinson and his predecessors
had always paid taxes on the entire of Stromness Island.
In this case the record declares that no Harsen had paid
taxes on the unsurveyed premises. Unlike the *Dickin-
son Case,* it appears here that any one who desired to
take up territory below the mounds did so without ob-

jection from the Harsens. Indeed, it appears that the defendant platted the land in controversy here, and offered it for sale to the public, to the extent of several hundred acres, without protest from the Harsens, and it was not until after the bill in this case was filed that the defendant acquired the so-called "Harsen title."

There is force in the contention of the complainant that the acceptance by the Harsen heirs of patents from the United States government which contain a definite description estops them from claiming land outside of those descriptions. *Manning* v. *San Jacinto Tin Co.*, 9 Fed. 726; *Ross* v. *Doe*, 1 Pet. (U. S.) 656; *Samson* v. *Smiley*, 13 Wall. (U. S.) 91. See many cases cited in 26 Am. & Eng. Enc. Law (2d Ed), pp. 387, 388. We shall not discuss this branch of the case further. We are willing to leave this question, including the claimed family traditions, where the circuit judge left it, simply citing *Cline* v. *Catron*, 22 Grat. (Va.) 378.

Any attempt to here review in detail the testimony as to the condition of the premises in question would extend this opinion beyond any reasonable limit. We shall, however, quote from two or three of the witnesses of the defendant as to the conditions at different times.

Capt. Albert E. Stewart, of Detroit, was born on this island in 1846. He testified on direct examination as follows:

" *Q.* Do you know where Rattray's is?
" *A.* Yes.
" *Q.* It is next to Rattray's place?
" *A.* Oh, well, there is land there. I have been there within three years; saw corn grow back there.
" *Q.* How was it in 1864? Fit for cultivation?
" *A.* Well, I couldn't say in '64; it must have been in '64, because I was cutting hay down there at the Fox Hole, and I assume that the water was low that year. The water gets high and low. Sometimes this whole country has been inundated, and at other times it would be dry land.
" *Q.* That is, the ice may back up the water?
" *A.* Yes, that would be only for a period, short period;

but I have seen the water high there for a whole summer.

"*Q.* On what land?

"*A.* Why, in the whole island, for that matter, nearly, I have seen it so that we had to hitch the boat to our garden fence to my place; now it is as high land as there is there, for a whole season as that I couldn't get from my place to the river without a boat.

"*Q.* That is on the surveyed portion?

"*A.* Yes, sir.

"*Q.* Can you recall what year that was in, Captain?

"*A.* No, I cannot. I know we always kept a boat there during that whole year, perhaps other years; and in fact I know there were other years when the water was very high. My father has always contended that the water was higher and lower at stated years; that is, that there would be a period of years in which it would be high, and then there would be a period in which the water would be low. In fact, he has taken me to what is now water is hardly low enough now to raise crops on; and you can go there now today, if you want to, and you can find the dead furrows where it has been plowed, plowed before my time. In fact, I can't remember when it was plowed. It was plowed before that. You can go and pace off so many paces for plowed land there, they call them dead furrows, so many paces. You will find if you step off seven paces, about 21 feet, you will find out you strike a dead furrow nearly every time.

"*Q.* What portion of the island is that on?

"*A.* That is the surveyed portion. * * *

"*Q.* We have a table of the level of the water there, Captain, appearing on page 501 of the record in the Olds Case. Now, by looking at that, you can state, the year 1864 and the years previous to that time, about how the one compared with the other?

"*A.* Oh, at times.

"*Q.* That is a government record.

"*A.* Well, I notice it varies here some, but not very much.

"*Q.* Well, for a few years back of 1864, did it vary materially?

"*A.* '64?

"*Q.* Yes.

"*A.* There is some difference in it, of course. In '62, 575, we will say, taking a record, 577 in August we will say, and 576 in '63 in August, 576 in '64 in August, of

course a fraction of a foot; I have seen the water there two feet high in a whole year, whole season.

"*Q.* The whole island?

"*A.* The whole island, notwithstanding the record.

"*Q.* Well, that would affect the land on the shore just the same, would it not?

"*A.* It certainly would.

"*Q.* Both on the American and Canadian shore?

"*A.* Yes."

And on cross-examination he testified as follows:

"*Q.* Now, I take it from what you say, that there are periods of high and low water during the times that you have lived on the island?

"*A.* Yes, sir.

"*Q.* That period of high water, it takes about seven years for it to come up to the highest point, doesn't it?

"*A.* I couldn't say that. I don't know the number of years. I said my father discussed that.

"*Q.* Isn't that the tradition of the island that it takes seven years for the water to come up to its highest point and seven years for it to recede to the lowest point?

"*A.* You don't want me to say that because I don't know that.

"*Q.* I was asking you if you had heard that tradition or talk among the old settlers?

"*A.* I can't state the number of years; but I know it takes a period, as you say.

"*Q.* Don't you know there are periods of years when it is some years until it comes to the extreme high point, and then it will take some years until it gets to the low point?

"*A.* I will assume that might be true, in any case.

"*Q.* Then that is true of Harsen's Island; in other words, there are periods of high water and periods of low water, and that varies, and then it takes some time for it to get up to a period of extreme high water, and then from extreme high water it takes some time for it to go to a period of extreme low water, that is correct, isn't it, Captain?

"*A.* I assume that might be true; yes, sir.

"*Q.* And the number of years it takes to go from one extreme point to the other extreme point, you are not able to state?

"*A.* No, sir.

"*Q.* Now, during the periods of extreme high water as

you remember them on the unsurveyed portion of the island, it would be practically covered with water wouldn't it?

"*A.* Yes, sir; I think it would.

"*Q.* And also a considerable of the surveyed portion?

"*A.* Certainly.

"*Q.* The place you speak of as the Fox Hole is one of the highest points on the unsurveyed part of the island, isn't it?

"*A.* I don't know.

"*Q.* Well, as you recollect it, isn't it?

"*A.* I couldn't say that.

"*Q.* What other points are there on the unsurveyed portion of the island where you have been to cut hay?

"*A.* There isn't any.

"*Q.* What was the character of the hay that you cut at the Fox Hole?

"*A.* Well, prairie hay.

"*Q.* Prairie hay?

"*A.* Yes.

"*Q.* Coarse hay, you mean?

"*A.* Why, yes.

"*Q.* Not timothy, is it?

"*A.* Oh, no; it isn't timothy, nor even redtop.

"*Q.* Not clover?

"*A.* No.

"*Q.* What you would call coarse marsh hay, isn't it, Captain?

"*A.* Well, it was hay such as we fed our cattle.

"*Q.* I mean, it was such hay as grows on marshy ground.

"*A.* Certainly not marsh ground, but prairie ground. I wouldn't say marsh; that kind of hay would be too coarse. The cattle couldn't eat it.

"*Q.* The speaking of it as prairie land don't mean similar to the western prairies?

"*A.* Oh, no; I don't know anything about that, not the alfalfa."

Capt. Eber Ward, called by the defendant, was 84 years old at the time his testimony was taken. He had, during his earlier life, sailed a small side-wheeler steamer running from Detroit to Port Huron; going up one day and down the next, passing through the South Channel along the territory in question. His boat was named the "Huron,"

and was 130 feet long, and drew from 4½ feet to 5 feet of water.   On cross-examination he testified:

"*Q.* I understand this channel you speak of near Algonac is a cut-off; it cuts off a portion of Harsen's Island?

"*A.* Yes, Harsen's Island, and the upper end is called 'Russell's Island.'

"*Q.* It is the cut-off that is there today?

"*A.* Yes, but it is not navigable.

"*Q.* Since the olden times that has been dredged out some?

"*A.* Maybe it is, I don't know about that.

"*Q.* At the time you were running on the lakes, you thought there was enough water in there to float the Huron?

"*A.* Yes, sir.

"*Q.* At the time of the high water in '38 that you speak of, what was the condition of the lower part of Harsen's Island?   Was it practically submerged?

"*A.* No, there was water in the marshes.   It wasn't exactly submerged.   There was rushes and grass.

"*Q.* The vegetation appeared above the water, but wasn't the land itself submerged?

"*A.* The land itself?

"*Q.* Was it always submerged?

"*A.* I think it was always submerged.

"*Q.* And the part that appeared above the water was simply the vegetation?

"*A.* Yes, the rushes.

"*Q.* And you thought the lower part of the island below the woods wasn't of any great value?

"*A.* There was no buildings or anything, and it wasn't worth anything.   There was a building that somebody built there.   It was all vacant.   I wouldn't take it as a gift.

"*Q.* Where Bedore's is, and the little church is, that was all practically submerged and low marsh land?

"*A.* Yes, sir.

"*Q.* The steering that you did by the bank that was by reason of the difference in the color in the water, you could tell where the bank was?

"*A.* We could tell where it was usually by the color.

"*Q.* And in the summer time after the vegetation grew up you could tell by the vegetation?

"*A.* We had that to guide us, of course.

"*Q.* You speak of the high water of '38, had it com-

menced to get high water, or had the water commenced to come up, before that year?

"*A.* In '37 the water was, I don't know as it was high then, but in '38 it rained tremendously, and heavy snows that winter, and the water came up high.

"*Q.* Have you any recollection one way or the other whether from '34 the water commenced to rise culminating in '38?

"*A.* I wasn't here in '34.

"*Q.* Have you a recollection whether in '37 the water was above normal?

"*A.* It was above normal, but not as near high as '38. It kept going up until '38 and then stopped.

"*Q.* With a stiff wind from the south, the water would come up much higher?

"*A.* Yes, raise it along the river St. Clair and the flats.

"*Q.* In the winter time would the ice cover the lower part of the island, I mean below the woods?

"*A.* No, it didn't go on to the land, the ice didn't. It would go up to the bank.

"*Q.* Have you seen the water when it would be high enough so there would be ice on the island?

"*A.* Perhaps, but I never seen much ice on the island.

"*Q.* Have you sailed in the winter?

"*A.* I have sailed as late as January.

"*Q.* But not during the season when the ice would be along there?

"*A.* The ice would make some years earlier than others.

"*Q.* A considerable part of this lower part where the buildings now are, the clubhouses and cottages is on made ground?

"*A.* Yes, they dug the channel or canal and threw up the earth, and that makes it or raises it.

"*Q.* And they put their buildings on there?

"*A.* Yes.

"*Q.* And some of the buildings were built on piles?

"*A.* Lots of them are built on piles. I would rather take the land higher up."

Abram Smith, one of the defendant's witnesses, swore generally, upon direct examination, that the condition of the island in general appearance about the year 1838 was as it is now.

"*Q.* Now, previous to 1838, did you see cattle feeding on the lower part of Harsen's Island?

"*A.* Yes, sir; going by on boats.

"*Q.* How far down would they go?

"*A.* Oh, well, I didn't see them down a great ways; I probably saw them down a half a mile."

And on cross-examination he testified as follows:

"*Q.* This high water that you speak of in 1837, that washed away buildings, was that building on the surveyed land?

"*A.* Sir? On the surveyed land?

"*Q.* Yes.

"*A.* Why, yes; it was. The Stewart section 1 building was; and the other was on the Harsen, Jacob Harsen, section.

"*Q.* Both of them on what we call the 'private claims?'

"*A.* Yes.

"*Q.* So that the water in 1837 was high enough to wash away buildings that were on the—

"*A.* I don't know; it was about that time. I wouldn't be specific, it was along there, '37 or '38, you know. It washed away buildings or land so that they moved the buildings. I don't know that it washed away the land on which Jacob Harsen's house was on; but it made it very unpleasant, so they moved the house back.

"*Q.* But it was about 1837?

"*A.* Yes, '37 or '38.

"*Q.* And that was as high water as you saw along in those years?

"*A.* I think so; I wouldn't say. It might— Yes, it was as high as I saw, that I know of.

"*Q.* And that water was so high that the lower portion of the island, the portion that is called the 'unsurveyed land,' was all covered?

"*A.* No, I don't think it was. Most all of it was, though.

"*Q.* Practically all of it?

"*A.* Yes, sir."

Mary L. Stewart, granddaughter of the original settler, testified to the condition on the unsurveyed portion as follows:

"*Q.* I understand you to say that when it was high water the biggest part of the unsurveyed portion would be covered with water?

"*A.* Yes, sir.

"*Q.* And at ordinary times a considerable portion of it would be covered.

"*A.* Yes.

"*Q.* And wouldn't the majority of it be covered at ordinary water; that is, from the mounds down?

"*A.* Yes, sir."

We do not mean to indicate by the above quotations that all of the defendant's witnesses testified to the conditions as stated by these witnesses. The defendant examined a large number of witnesses, and it is impossible to reconcile all of the testimony in the case, as there is a sharp conflict. Many of the witnesses were old people, of varying intelligence and recollection.

There is unnecessary criticism of witnesses by counsel upon both sides. In the nature of things, and according to the experience of any person at all accustomed to hearing and weighing oral evidence of this nature, it generally appears that witnesses will vary in the recollection of facts or conditions existing from a quarter to a half century ago, in a very large degree. It is the duty of a court to weigh the reasonableness of such testimony, and try to get at the truth. Of course, we know that witnesses are at times prone to allow their interest or partisanship to warp their recollection.

That these were unsurveyed lands, and within the meandered lines, is significant. Upon this whole record we are satisfied that the circuit judge reached the right conclusion upon the facts in the case, and there is no profit in a further discussion of the evidence. By a preponderance of the evidence, both oral and documentary, we conclude, as did the circuit judge, that the premises in question were in fact a part of the bed of Lake St. Clair at the time of the admission of the State of Michigan into the Union, and that the title to the fee passed to the State by virtue of the admission.

The depth of water upon submerged land is not important in determining the ownership. The condition of this territory when the State was admitted into the Union is

the condition which must control. That the State of Michigan holds these lands in trust for the use and benefit of its people—if we are correct in our conclusion—cannot be doubted. The State holds the title in trust for the people, for the purposes of navigation, fishing, etc. It holds the title in its sovereign capacity. *People* v. *Silberwood*, 110 Mich. 103 (67 N. W. 1087, 32 L. R. A. 694); *State* v. *Fishing & Shooting Club*, 127 Mich. 580 (87 N. W. 117).

An exhaustive discussion of the nature of the State's title to the land beneath the waters of the Great Lakes, and of the question whether any part of such territory can be acquired, as against the State, by adverse possession, will be found in the minority opinion of Justice HOOKER in the last above case. It there clearly appears from an abundance of authority that title to submerged lands in the Great Lakes held by the State cannot be devested by adverse possession; it being held in trust for the public, according to the original cession from Virginia and the ordinance of 1787. The late case of *Illinois Steel Co.* v. *Bilot*, 109 Wis. 418 (84 N. W. 855, 85 N. W. 402, 83 Am. St. Rep. 905), supports this view. *Olds* v. *Commissioner of State Land Office*, 150 Mich. 134 (112 N. W. 952); *Ainsworth* v. *Hunting & Fishing Club*, 159 Mich. 61 (123 N. W. 802).

The questions of water line and estoppel are answered by the above authorities.

The trust in the State is an express trust; and the rule is too well settled to need citation of authorities that, as against the State as the trustee of an express trust, the statute of limitations will not run. 1 Cyc. p. 1113, and cases cited.

The decree below is affirmed, with costs.

MONTGOMERY, C. J., and OSTRANDER, HOOKER, and MOORE, JJ., concurred.