AUDITOR GENERAL v. KLENK.

1. BOUNDARIES—COUNTIES—PRIVATE SURVEY.
A private survey in 1960, made for defendants in action by auditor general to sell property for nonpayment of taxes, to establish boundary between 2 counties as laid out by government surveyor in 1816 *held*, not to prevail over survey made 6 years later by the 2 counties where the boundary established by the later survey was near the line established 48 years earlier by the 2 counties jointly.

2. SAME—MUNICIPAL CORPORATIONS—ACQUIESCENCE.
Long acquiescence in boundaries between municipal corporations constitutes a decisive factor when such boundary comes into dispute between municipalities.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 8] 12 Am Jur 2d, Boundaries § 113.
[2] 12 Am Jur 2d, Boundaries §§ 85, 86.
[3] 12 Am Jur 2d, Boundaries § 112.
[4, 6] 12 Am Jur 2d, Boundaries § 61.
[5] 12 Am Jur 2d, Boundaries §§ 111, 112.
[7] 20 Am Jur 2d, Costs § 10 *et seq.*

3. SAME—GOVERNMENT SURVEY—OCCUPATION—ACQUIESCENCE.

Private survey, made for defendants in action by auditor general to sell property for nonpayment of taxes, which claimed to have located boundary according to government survey made in 1816 but where no monuments were found which were put there by the surveyor and where no occupational lines have been proven which follow his survey, *held*, not to prevail over joint survey conducted by 2 counties which followed border established and survey made 48 years before which is supported preponderantly by occupational recognition and continued acquiescence.

4. SAME—JOINT SURVEY—COMPUTERS.

Survey conducted by joint efforts of 2 counties which had use of computer and modern equipment to check for errors is accorded more weight than one conducted 150 years before without the use of such equipment.

5. SAME—SURVEY—FIELD NOTES—COMPUTERS.

Field notes made in surveying boundary between 2 counties in 1816 in which a significant portion was stricken leaves doubt as to the reliability of the notes and a 1960 survey claiming to have found the line made in this earlier survey should not prevail over a 1966 survey which established boundary along a line which had been established in 1918 where surveyors in 1966 had use of modern equipment and computers to check their work for errors.

6. SAME—SURVEY.

Survey conducted in 1966 confirming boundary established in 1918 *held*, to be best available evidence of original location of boundary established in 1816 and is adopted for adjudicatory purposes.

7. COSTS—BOUNDARY DISPUTE.

No costs are allowed in action by auditor general to sell land for nonpayment of taxes on review of supplemental judgment establishing boundary between 2 counties.

DISSENTING OPINION.

O'HARA, J.

8. BOUNDARIES—COUNTIES—PRIVATE SURVEY.

*Finding of circuit judge was correct that a private survey made in 1960 for defendants in action by auditor general to sell property for nonpayment of taxes established boundary line between 2 counties as laid out by government surveyor in 1816.*

Appeal from Macomb, Miller (Allan C.), J., presiding. Submitted June 12, 1968. (Calendar No. 12, Docket No. 50,718.) Decided September 25, 1968. Rehearing denied November 11, 1968.

Petition by Otis M. Smith, Auditor General, for the sale of land for taxes. William C. Klenk and Margaret T. Klenk, with Joseph Cassese subsequently intervening, filed objections to the inclusion of their properties claiming improper assessment and taxation. Motion by various municipal and governmental bodies to strike portion of objections was granted. Reversed and remanded; see 367 Mich 65. On remand the boundary line between Macomb and Wayne counties was based on 1960 survey. Attorney general and local units of government appealed. On July 14, 1965, a second order of remand was issued to join all necessary parties. Supplemental judgment established boundary line based on a 1966 survey. On review of supplemental judgment, judgments entered by circuit court vacated and entry of a new judgment based on a 1966 survey ordered.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Nicholas V. Olds* and *Warren R. Snyder,* Assistant Attorneys General, for plaintiff.

*Huffaker, Hollingshead & Daane, Joseph A. Cassese, Daniel P. Cassidy,* and *Lungerhausen & Stair,* for defendants.

*John H. Yoe,* for intervenor South Lake School District, and as City Attorney together with *Robert M. Fraser,* Assistant City Attorney, for intervening City of St. Clair Shores.

*George N. Parris,* Prosecuting Attorney, *Alfred A. Blomberg,* Civil Counsel, and *Ray W. McPeters,* Assistant Corporation Counsel, for intervenor County of Macomb.

*William L. Cahalan,* Prosecuting Attorney, *Aloysius J. Suchy* and *William F. Koney,* Assistant Prosecuting Attorneys, for County of Wayne.

*Frank I. Kennedy,* for added parties in interest Fraser and Wilson.

Per Curiam. This case was before the Court in 1962. The result was reversal and remand for full hearing. See *Auditor General* v. *Klenk* (1962), 367 Mich 65. Thereafter Circuit Judge Allan C. Miller, of the 23d circuit, undertook hearing and determination of the merits. His first judgment, ruling that the herein considered Munzel survey properly delineated the questioned portion of the boundary between Macomb and Wayne counties, was appealed to this Court by the attorney general and counsel for intervening local units of government. In the course of submission of that appeal it was learned that all parties requisite to complete determination of the central and originally posed question had not been brought before the Court. Accordingly, a second order of remand issued July 14, 1965. The order proceeds:

"Ordered that the original record be and the same is remanded to the circuit court for the county of Macomb with instruction that the court order joinder of all necessary parties, as same may be determined by that court, including the county of Wayne, and that the court require of parties thus newly joined that each plead to the issue which was remanded for hearing in *Auditor General* v. *Klenk,* 367 Mich 65.

"The circuit court thereupon will proceed to hear such additional proof as may be desired by all parties and will prepare a supplemental opinion and new judgment upon the record as supplemented; whereupon the original and supplemental record may be certified to this Court for consideration and such further proceedings in this Court as may then be ordered."

This order has been fully executed by Judge Miller. The county of Wayne appeared and participated actively in the supplemental hearing. A supplemental record, consisting of more testimony, additional exhibits, a supplemental opinion and a supplemental judgment, was made and certified as in the July 14 order provided. The supplemental judgment reversed the result of Judge Miller's first judgment. The essence thereof rests upon these supplemental findings:

"1. That all public authorities adopted the so-called Dingman-Lehner line from 1944 to the present and that the joint survey of 1966 (Wayne county exhibit 1a, 1b, 1c) documents this line by field notes and drawings duly recorded and relates the same to physical monuments presently existing on the ground.

"2. That said line depicts the present line of occupation between said counties of Wayne and Macomb.

"3. That deplorable consequences would result in disrupting this line as the county and municipal line in use extensively from 1956 to date, during which time the area has been developed into subdivisions and homes erected thereon, including the utilities and improvements necessary thereto.

"a. Only 10% of the lots in the area are vacant today.

"b. Nearly all of the public utilities and houses were constructed after the tenure of Fred R. Cheek,

city engineer for St. Clair Shores. He was in office from 1956 to 1962.

"4. That the document known as joint survey— 1966, recorded in liber 15965, page 486 *et seq.,* Wayne county records, be and is hereby found to be the established and located county line on the ground for all purposes hereafter."

Since remand by the order of 1965, the central issue has changed. Now that issue is whether a private survey made for the defendant objectors in 1960 by Herbert Munzel, a civil engineer, said by these objectors as having located the northerly boundary of Wayne county according to a survey made in 1816 by government surveyor Joseph Fletcher, should be held prevalent over the "Dingman-Lehner" county line survey of 1918 and the coincident or near coincident "joint survey of 1966." To put the issue conversely, it is whether for the same locating purpose the "joint" county line survey of 1966 should prevail over the Munzel survey. Our answer, given *de novo* upon the whole record, is that Judge Miller was right in giving dominant effect to the manifestly more exacting survey of 1966.[1]

To portray in our official report the divergence of the two last mentioned lines of survey, request was made of counsel that a stipulated sketch be made and sent to the clerk; such sketch to depict the locus and measurement, at and near the lake shore, of the width of such divergence. Counsel were unable to stipulate with result that a choice has been compelled between 2 separately contributed sketches. One, appearing at the margin, has been accepted

---

[1] This latest survey is designated "joint" and was received by the court with that label because of determination by the boards of supervisors of Wayne and Macomb counties that the county boundary in the involved area should be surveyed and determined by cooperative expense and effort, and that the joint product should be offered as evidence in this then pending action.

Sketch depicting the area of divergence.

as somewhat less argumentative.  To it we add explanatory factual comment as follows:

The base line referred to in the record is known generally as the boundary which divides the counties of Oakland and Macomb from Wayne county.  Along that line 8 Mile road extends east, from and beyond the western boundary of Wayne county, to the intersection of 8 Mile with the west end of Detroit's southeasterly bearing Vernier road.  All parties agree that Mr. Fletcher extended the base line east from a point near that intersection to the international boundary in Lake St. Clair, thus completing the county line.  As to such extension, however, no trail, road, or other like definitive line has ever been cut through or graded, either to Jefferson avenue as and when extended, or to the lake.  No occupational line has been established along the actual or supposed line of the Fletcher extension.  No recorded recognition of that line has been shown save only a plat of land known as Gaukler Pointe Shores, made in 1916.[2]  And if any artificial objects or monuments were placed along the line of the Fletcher extension "by the hand of man," meaning Mr. Fletcher's hand (*Cf* 12 Am Jur 2d, Boundaries, § 4.  Monuments, pp 549, 550), the same cannot now be found.

---

[2] The Gaukler plat extends diagonally from the west to the west side of what is now Jefferson avenue in lines parallel with all of the nearby northwesterly-southeasterly boundaries of private claims. It extends across both of the depicted lines of survey.  At certain points it was tied to a designated county line which Mr. Munzel later ascertained and followed.  The Dingman-Lehner survey was not of course made until 1918.

With reference to the Gaukler plat, Judge Miller determined in his supplemental judgment:

"It is further ordered that the plat of Gaukler Pointe Shores Subdivision No. 1, recorded in liber 3 of plats, page 67, Macomb county records, and liber 37 of plats, page 14, Wayne county records, is hereby modified so that the county line shown therein shall be changed in accordance with that location of the county line as established by the joint survey of 1966, mentioned in the last preceding paragraph."

The beginning hint of question as to the precise location of the county line, near the lake, seems to have been the auditor general's insistence that a county boundary survey should be made and recorded by the local authorities.[3]   That was done. The result is known in the record as the Dingman-Lehner survey of 1918.

Mr. Dingman then was county surveyor of Wayne. Mr. Lehner then was county surveyor of Macomb. Mr. Dingman made the survey, prepared the required notes and plat and saw to the recording of the plat.   Mr. Dingman deceased prior to any of the hearings below.   His notes could not be located.   Mr. Lehner's part in the project seems only to have been that of attesting the plat by signature. His testimony, due as we perceive to age and dimming memory, was not particularly helpful beyond the giving of a general picture of the former condition of the area.

The foregoing summarizes in general the situation as it stood immediately prior to and at the time of the Dingman-Lehner survey.   It brings to focus the comparative situation as it stood in the beginning, prior to commencement of development of the area.

The boundaries of all private claims which then and now extend across both sides of this area antedated the Fletcher survey.   They were located and patented according to parallel boundaries extending inland from the lake for considerable distances, in the case of private claim 222, nearly 3 miles.   One haunting cause of the present dispute may lie in the fact that such parallel boundaries extended inland

---

3 For evidence of the auditor general's request that "the authorities of Wayne and Macomb counties establish the line," see paragraph numbered 11 of the appendix hereto, consisting of a portion of Judge Miller's first opinion.   The immediately precedent making and recording of the Gaukler plat may have been the cause, or one of the causes, of the auditor general's request.

from the shore some few degrees north of west. There certainly is no doubt that in 1816 the easterly end of private claim 222 was partly in what is now Macomb county and partly in what is now Wayne county; also that it remains so today. And it is in that end that the important part of this boundary-questioned area lies.

For an appreciable distance inland the area of the easterly extended base line originally was marshland, subject presumptively to the same fluctuations of the level of Lake St. Clair as came to consideration in *State* v. *Venice of America Land Co.* (1910), 160 Mich 680. From the testimony of Mr. Lehner, and by comparing the Macomb county atlas of 1895 with the Macomb county atlas of 1916,[4] we gather that the mentioned marshy condition prevailed substantially until about the turn of the century.

As against the situation as same stood prior to the time of the Dingman-Lehner survey, radical changes have since taken place. Starting with emphasis prior to and during World War 2, and accelerating rapidly thereafter, the area in and around this boundary-disputed triangle was filled and raised for construction and municipal improvement purposes. Now and for some years it has consisted generally of an excellent residential district characterized by all of the zoned attributes thereof and the installation of water mains, drainage and sewer lines, service utilities, et cetera. Now and for some years there have been lines of occupation and legal recognition giving rise to the controversially-briefed question of acquiescence in the Dingham-Lehner survey. Now and since 1925 the southern

---

[4] The comparison shows that some time during the interval between 1895 and 1916 the Detroit United Railway graded up and extended, roughly 1000 feet inland at this point, its electric "Shore-line" from East Jefferson avenue in Detroit toward Mount Clemens. This rail line is the first real evidence in the record of the opening up of the marshy lakefront.

boundary of Macomb county's village of St. Clair Shores (now city of St. Clair Shores) has been anchored to and coincides with the line of the Dingman-Lehner survey.

This brings us to the stated central issue. The correct resolution of that issue depends upon careful comparison of Mr. Munzel's testimony with considerable opposing testimony given by other present day engineers. All of these witnesses, Mr. Munzel included, were fully qualified. No portion of their testimony, as it reads, raises any question of credibility. Understandable zeal for the causes of their respective employers is the only factor of cautionary approach.

The testimony of each engineer was given for the purpose of locating, if possible or as closely as possible, the Fletcher line of 1816 as it approached Lake St. Clair. But the careful reader of the whole thereof is left with abiding conviction that no witness has, and no field party however skilled could, locate the Fletcher line (on the ground rather than the drawing board) other than by rough approximation. We are left accordingly with proof developing in the present century, commencing prominently with the fact and ensuing recognition of the Dingman-Lehner survey.

Due consideration of all testimony received has left the Court with additional impressions of determinative moment. The first is that Mr. Fletcher attempted to and did, in *this area,* lay out and record a line which extended across then pretty much worthless swampland. Aside from aquatic birds and animals, it was inhabited only by a few settlers who, having filed or perfected their private claims, resided in the vicinity.[5] He had no reason for

─────

[5] See the interesting history and description of these private claims which Mr. Lloyd L. Axford wrote in his Michigan Law of Conveyancing, published in 1921 by Fred S. Drake, pp 43, 44.

modern day precision and none of today's means of ascertainment thereof. His task was difficult and is fraught with the acknowledged fact (*Diehl* v. *Zanger* [1878], 39 Mich 601, 605) that few of these early government surveys can withstand the test of a careful and accurate survey "without disclosing errors." Now there are no located or discoverable monuments which may have been set by him. Nor have any occupational lines been proven which follow his survey, whereas the Dingham-Lehner survey is supported preponderantly by occupational recognition and preponderant proof of continued acquiescence. As to the effect of such proof, see *Elberta* v. *City of Frankfort* (1956), 347 Mich 173, 184.

The next is that all these surveys of the early 1800's cannot be accorded the verity of modern corresponding work. The former as to course depended alone upon the magnetic compass with its limited length of sight and subjection of the needle to the inaccuracies of variation and deviation. Mr. Fletcher also had no advantage, as did the 1966 survey party, of having his surveying errors, if any, discovered and corrected by a computer prior to completion of the work assigned to him. Nor did Mr. Munzel have such an advantage, so far as his testimony discloses.

The next is that Mr. Fletcher's field notes disclose, without explanation, that a significantly pertinent portion thereof was stricken out by the drawing of lines through such portion. It is not known whether that was done by Mr. Fletcher himself or, as objector William C. Klenk theorized, by some unauthorized person "in Washington" after the notes were filed in the surveyor general's office. The result in any event leaves doubt that the Fletcher notes are reliable, at least for present purposes.

The last of these notable impressions stems from an enigmatic portion of Mr. Munzel's testimony.

He said that Fletcher's line as it extended eastward
was determinable properly by "Not where he tried
to go, but where he went"; also that Fletcher didn't
go due east.  Mr. Munzel is testifying, connectedly:

"*Q.* Now, there was some questioning on cross-ex-
amination about Fletcher's bearings, and you testi-
fied that he bore east.  I believe the court asked you
why you did not go east as well.  Did Fletcher
actually go east, if you know?

"*A.* As well as he could with the instruments that
he did have.  He was going generally east.

"*Q.* He was trying to go east?

"*A.* Yes.

"*Q.* But on the basis of the evidence which you
have discovered did he do so?

"*A.* No, I am sure he did not.

"*Q.* If he had, your line would be a due east line,
wouldn't it?

"*A.* It wouldn't have a bend in it for one thing.

"*Q.* And it would not have any courses on it which
varied from due east, would it?

"*A.* My line?

"*Q.* Yes.

"*A.* Rephrase the question.

"*Q.* Well, if Fletcher had in fact succeeded in
what he was trying apparently to do, namely, to go
due east, then your line would be the same thing,
would it not?

"*A.* Yes.

"*Q.* Did the surveyors in Fletcher's area use a
compass mounted on a mast for setting directions?

"*A.* Yes.

"*Q.* And this on the magnetic pole?

"*A.* Yes.

"*Q.* Would this explain in your opinion a devia-
tion by Fletcher, a deviation from a due east course?

"*A.* That would help explain, yes.

"*Q.* Your function as a surveyor is to find where
he actually went?

"*A.* Yes.

"*Q.* Not where he tried to go, but where he went?
"*A.* Yes.
"*Q.* And is that what you have done?
"*A.* Yes, sir. I have tried to."

To summarize and remand:

The foregoing suggests cogently that the joint survey of 1966, confirming as it does the 1918 Dingman-Lehner line, is the best available evidence of the original location of the Fletcher line and, hence, of the originally established boundary which divides Macomb county from Wayne county in the vicinity of Lake St. Clair. The 1966 survey is therefore adopted for adjudicatory purposes and the record will be remanded with instruction as follows:

To clear the way for entry of a new decretal judgment the circuit court will vacate the judgment entered December 16, 1963, and the supplemental judgment entered September 25, 1967. Thereupon that court will settle and enter such new judgment as will finally adjudicate adoption as above of the 1966 survey. The judgment will determine such remaining questions as depend upon that adjudication and will provide all necessary relief as may be incident to and due on account thereof.

No costs will be awarded, below or here.

DETHMERS, C. J., and KELLY, BLACK, and T. M. KAVANAGH, JJ., concurred.

### APPENDIX—PORTION OF JUDGE MILLER'S FIRST OPINION, FILED NOVEMBER 5, 1963

"This court makes the following findings of fact:
"1. In 1816 Joseph Fletcher, a surveyor, was employed by the United States surveyor general to survey the Michigan base line from a point approximately where the city of Northville is presently lo-

cated, eastward to the shoreline of Lake St. Clair. Mr. Fletcher's authority to do so was contained in instructions, objectors' exhibit 2, on the second page of which is found the following recital:

" 'You will then continue the base line to the eastern boundary of the territory, which will probably be at a point on the border of Lake St. Clair.'

"2. Joseph Fletcher's field notes (objectors' exhibit 3), together with his letter to Edward Tiffin dated September 30, 1816 (objectors' exhibit 4), indicate that Fletcher did just as he was instructed. He ran the base line to the shore line at a point 1.73 chains (114.18 feet) south of the northeast corner of private claim 222.

"3. By executive act of Lewis Cass, governor in and over the territory of Michigan, by proclamation dated November 1, 1815, the county of Wayne was bounded as follows:

" 'Beginning in Lake St. Clair, on the boundary line between the United States and the British province of upper Canada, at a point due east from the intersection of the base line with Lake St. Clair, and running thence west to the line between the seventh and eighth ranges, east of the principal meridian, thence with the said line, south, to the line between the townships numbered 4 and 5, south of the base line; thence with the said line, between the said townships 4 and 5, to the middle of the river Huron of Lake Erie; thence with the said river, keeping the middle thereof, to its mouth; thence east to the boundary line between the United States and the province of upper Canada; thence with the said boundary line to the place of beginning.'

"4. When Michigan became a state, the first Michigan legislature enacted CL 1948, § 45.1 (Stat Ann 1961 Rev § 5.281), the effect of which is to permanently establish county boundaries as they then existed unless they shall be changed by action only of the legislature. This statute has never been repealed, and the legislature has never acted to alter

the base line boundary between Wayne and Macomb counties.   *   *   *

"11. In 1918 George A. Dingman, county surveyor for Wayne county, Michigan, and Walter J. Lehner, county surveyor for Macomb county, Michigan, both having been duly elected, qualified and acting as such surveyors, subscribed to a survey and prepared a map showing the location of the county line between Grosse Pointe township, Erin township, Wayne county and Macomb county, Michigan, from Mack avenue to Jefferson avenue, which contains the notation,

" 'Through Hon. O. F. Fuller, auditor general, of Lansing, Michigan, Charles H. Doxtater, of Detroit, Michigan had the authorities of Wayne and Macomb counties establish the line and place monuments as shown.'

"12. The Wayne county road commission in the year 1925 made a survey describing the same line as established by the Dingman-Lehner survey, exhibit 22 in this cause."

O'Hara, J. (*dissenting*). I am obligated to state that I believe Circuit Judge Allan C. Miller was correct in his initial holding after this Court's first order of remand (367 Mich 65). I therefore dissent from the majority opinion.

Adams and T. E. Brennan, JJ., did not sit.